Filed 7/25/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re J.G., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,  Plaintiff and Respondent,  v.  J.G.,  Defendant and Appellant. | A139869  (San Francisco County Super. Ct. No. JW 11-6377) |

J.G. challenges juvenile court orders finding that he committed felony possession of a concealed firearm and sentencing him to an unlocked facility for boys. He claims that the court improperly denied his motion to suppress the firearm from being introduced into evidence. We agree and therefore reverse the judgment.[1]

---

[1] J.G. also asks us to review the transcript of an in camera hearing held under *Pitchess v. Superior Court* (1974) 11 Cal.3d 531, at which the juvenile court determined no law-enforcement personnel records should be disclosed to J.G. Such a review is unnecessary in light of our reversal of the judgment.

# I.
## FACTUAL AND PROCEDURAL BACKGROUND

The relevant facts are undisputed. On January 7, 2012, at around 8:45 p.m., Officer Steven Woelkers was driving his patrol car in Daly City when he saw 15-year-old J.G. walking across a parking lot toward D.G., who is J.G.'s brother. J.G. was carrying a backpack. Officer Woelkers parked his patrol vehicle, without turning on its lights or siren, and "casually" approached the brothers. He had decided to initiate "a consensual encounter" with them because he "stop[ped] and talk[ed] to people all the time" on his beat. He was wearing his uniform.

Officer Woelkers asked the brothers if he could speak to them, and J.G. responded, "[Y]eah." Officer Woelkers "made casual conversation . . . [and] asked [the brothers] what they were up to." J.G. said they were going to a party. Less than a minute after Officer Woelkers started the conversation, Officer Edward Klier arrived in his patrol vehicle to "assist . . . [¶] . . . [¶] . . . by monitoring the subjects as [Officer Woelkers] was contacting them." Officer Klier was standing about five to seven feet away from Officer Woelkers. He could not remember most of the details of Officer Woelkers's interaction with them or whether he spoke to the brothers.

Officer Woelkers asked D.G. for identification, and D.G. gave him a Honduran identification card. Officer Woelkers ran a records check that revealed that no California driver's license or identification card had been issued to D.G. He then asked J.G. if he had any identification, and J.G. responded, "[N]o." He asked J.G. for his name, and J.G. gave him a false one. J.G. also provided a date of birth that, although inaccurate by a few months, still indicated he was 15 years old. Officer Woelkers ran a records check and learned that no California driver's license or identification card had been issued to anyone with the name and birthdate J.G. had provided. Officer Woelkers testified that it was "not uncommon" for someone of J.G.'s approximate age not to have a California driver's license or identification card.

Officer Woelkers "asked [D.G.] if he had anything illegal on his person," and D.G. responded, "[N]o." Officer Woelkers then "asked [D.G.] if [he] could go ahead and search his person," and D.G. responded, "[Y]es." Officer Woelkers searched D.G. and "found nothing illegal on his person." He then asked J.G. "if he had anything illegal on his person," and J.G. said, "[N]ope." Officer Woelkers "asked [J.G.] if [he] could search his person," and J.G. responded, "[Y]es." Officer Woelkers then conducted the search, which he testified normally consisted of his asking a subject "to place [the subject's] hands behind [the subject's] back" and then "hold[ing the subject's] hands with [his] left hand" while patting the subject's clothes and feeling inside the subject's pockets. Officer Woelkers found nothing illegal while searching J.G.

Meanwhile, two more officers, Officer Korey Sprader and Officer Sheldon,[2] arrived to return a rifle to Officer Klier.[3] Officer Klier retrieved the rifle and began talking to Officers Sprader and Sheldon while Officer Woelkers continued to speak to D.G. and J.G. At this point, four uniformed officers and three marked patrol cars were at hand.

Officer Woelkers asked the brothers "if they would be willing to have a seat on the curb." They responded, "[Y]es," and they sat down. Officer Woelkers then asked J.G. "if that was his backpack that [Officer Woelkers] had seen him place down behind [a] pole," and J.G. said it was. Officer Woelkers inquired "if there was anything illegal in it," and J.G. stated, "[N]o." Then, Officer Woelkers "asked J.G. if [he] could search it," and J.G. said, "[Y]eah." When Officer Woelkers picked up the backpack, he noticed that it felt heavy. He unzipped it and located a Smith & Wesson semiautomatic pistol inside. Officer Woelkers put J.G. in handcuffs and asked Officer Sprader to place D.G. in handcuffs "for officer safety purposes." J.G. said, "That ain't mine. I don't know how it got in there."

---

[2] Officer Sheldon's full name does not appear in the record.

[3] Officer Woelkers originally testified that he "believed" these officers arrived immediately after he had searched J.G., but on cross-examination he said he could not recall when they arrived.

About ten or fifteen minutes passed between Officer Woelkers's first contact with the brothers and his arrest of J.G.  Officer Woelkers testified that throughout the encounter, his demeanor was "[v]ery calm, casual." Officer Klier similarly testified that his own demeanor throughout the encounter was "[v]ery mellow" and that Officer Woelkers's was "[p]robably the same, casual."

Three days after J.G. was arrested, the San Mateo County District Attorney filed a petition under Welfare and Institutions Code section 602, subdivision (a) alleging that the juvenile court had  jurisdiction over him based on various allegations related to the January 7 encounter, including one allegation of felony possession of a concealed firearm by a minor.[4]  After J.G. admitted that allegation in June 2012, the remaining allegations were dismissed and the case was transferred to San Francisco County for disposition.

J.G. then successfully moved to withdraw his plea, and an amended petition was filed by the San Francisco County District Attorney.  The amended petition alleged J.G. had committed three felonies—possessing a concealed firearm as a minor, carrying a concealed firearm, and carrying a loaded firearm in public—and one misdemeanor, giving false identification information to a police officer.[5]

J.G. moved under Welfare and Institutions Code section 700.1 to suppress the pistol from being introduced into evidence.  The juvenile court denied the motion after a contested hearing at which Officers Woelkers and Klier testified.  The court found "both officers' testimony to be credible, that in fact this was a consensual stop, and that [J.G.] consented to the search of his backpack leading to the discovery of the firearm."

The following month, the contested jurisdictional hearing was held, and the juvenile court sustained the amended petition's allegation that J.G. had possessed a concealed weapon and found the remaining allegations untrue.  At the subsequent

---

[4] This allegation was brought under Penal Code section 29610.  All further statutory references are to the Penal Code unless otherwise noted.

[5] The felony allegations were brought under section 29610 (possessing a concealed firearm as a minor); section 25400, subdivision (a)(2) (carrying a concealed firearm); and section 25850, subdivision (a) (carrying a loaded firearm in public).  The misdemeanor allegation was brought under section 148.9, subdivision (a).

dispositional hearing, the court denied J.G.'s motion to reduce the charge to a misdemeanor and committed J.G. to an unlocked facility for boys for not more than five years and eight months.[6]

## II.
### DISCUSSION

J.G. argues that the juvenile court improperly denied his motion to suppress because his consent to the search of his backpack was not voluntary. He contends that his consent was not voluntary because he was detained when he gave it. We agree.

### A. *The Applicable Legal Standards.*

The People bear the burden of justifying a warrantless search or seizure. (*People v. Suff* (2014) 58 Cal.4th 1013, 1053.) In particular, "[w]here, as here, the prosecution relies on consent to justify a warrantless search or seizure, it bears the 'burden of proving that the defendant's manifestation of consent was the product of his free will and not a mere submission to an express or implied assertion of authority. [Citation.]' [Citation.] Consent that is the product of an illegal detention is not voluntary and is ineffective to justify a search or seizure." (*People v. Zamudio* (2008) 43 Cal.4th 327, 341.)

The only issue we need resolve under this framework is whether J.G. was detained at any point before he consented to the search of his backpack. The parties do not dispute that if we conclude J.G. was detained we must conclude that the detention was illegal because there was no "reasonable [and] objective" "articulable suspicion that [he] ha[d] committed or [was] about to commit a crime" until the pistol was discovered.[7] (*Florida v. Royer* (1983) 460 U.S. 491, 498; *People v. Stier* (2008) 168 Cal.App.4th 21,

---

[6] The month before, J.G. had been committed to the same facility for a period not to exceed five years in connection with his guilty plea to allegations in two previous petitions filed in San Francisco County.

[7] Although J.G. provided a false name and birthdate to Officer Woelkers, which is a crime (§ 148.9, subd. (a)), Officer Woelkers did not become aware the information might be false until after he arrested J.G. Accordingly, this false information could not have been a basis for Officer Woelkers to have had, at the time of any detention, a reasonable and objective suspicion that J.G. had committed or was about to commit a crime.

5

28.) The parties also do not dispute that if there was an illegal detention, J.G.'s consent to the search of his backpack was not voluntary because it was the fruit of that detention. (See *People v. Zamudio*, *supra*, 43 Cal.4th at p. 341.) And finally, the parties do not dispute that if the motion to suppress was improperly denied, the error was prejudicial under *Chapman v. California* (1967) 386 U.S. 18. (See *People v. Neal* (2003) 31 Cal.4th 63, 86.)

The standards we use to review whether there was a detention are clear. "Whether a seizure occurred within the meaning of the Fourth Amendment is a mixed question of law and fact" subject to de novo review. (*People v. Zamudio*, *supra*, 43 Cal.4th at p. 342.) " '[W]e review the [lower] court's findings of historical fact under the deferential substantial evidence standard, but decide the ultimate constitutional question independently." (*Ibid.*) Here, as J.G. acknowledges, we "must defer to the juvenile court's findings that the two officers gave credible testimony and that [he] agreed to allow Officer Woelkers to search his backpack." And there are no contentions that these findings were unsupported by substantial evidence. Accordingly, we must determine whether a detention occurred as a matter of law based on the facts as established by the officers' testimony.

B.      *J.G. Was Detained Before He Consented to the Search of His Backpack.*

A seizure of a person implicating the Fourth Amendment occurs " 'when [a police] officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen.' " (*Florida v. Bostick* (1991) 501 U.S. 429, 434.) An officer must either "intentionally appl[y] hands-on, physical restraint" or "initiate a show of authority, to which the objectively reasonable innocent person would feel compelled to submit, and to which the suspect actually does submit for reasons solely attributable to the police show of authority." (*People v. Cartwright* (1999) 72 Cal.App.4th 1362, 1367, italics omitted.) "Unlike a detention, a consensual encounter between a police officer and an individual does not implicate the Fourth Amendment. It is well established that law enforcement officers may approach someone on the street or in another public place and

6

converse if the person is willing to do so" without having any "articulable suspicion of criminal activity." (*People v. Rivera* (2007) 41 Cal.4th 304, 309.) "[T]he crucial test is whether . . . the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.' " (*Florida v. Bostick*, at p. 437.) This test "is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." (*California v. Hodari D.* (1991) 499 U.S. 621, 628.)

In determining whether a reasonable person would have believed he or she was free to ignore the police presence and go about his business, a court " 'must consider all the circumstances surrounding the encounter' . . . [and] assess[] the coercive effect of police conduct as a whole, rather than emphasizing particular details of that conduct in isolation." (*In re Manuel G.* (1997) 16 Cal.4th 805, 821.) Relevant factors include "the presence of several officers, an officer's display of a weapon, some physical touching of the person, or the use of language or of a tone of voice indicating that compliance with the officer's request might be compelled." (*Ibid.*) The officer's and the suspect's subjective states of mind, however, are "irrelevant in assessing whether a seizure triggering Fourth Amendment scrutiny has occurred." (*Ibid.*)

J.G. argues that we should account for his age in considering whether a reasonable person would have felt free to end the encounter. He relies on *J.D.B. v. North Carolina* (2011) 131 S.Ct. 2394 (*J.D.B.*), in which the United States Supreme Court held that "the age of a child subjected to police questioning is relevant" to determining whether a defendant has been taken into custody for purposes of *Miranda v. Arizona* (1966) 384 U.S. 436, "so long as the child's age was known to the officer at the time of police questioning[] or would have been objectively apparent to a reasonable officer." (*J.D.B.*, at pp. 2398-2399, 2406.) Like the analysis whether a person has been detained under the Fourth Amendment, the analysis "whether a suspect is 'in custody' " under the Fifth Amendment "is an objective inquiry," focusing on whether under the circumstances " 'a reasonable person [would] have felt he or she was at liberty to terminate the interrogation

and leave.' " (*Id.* at p. 2402.)  In *J.D.B.*, the Supreme Court determined that "a child's age '[could] affect[] how a reasonable person' in the suspect's position 'would perceive his or her freedom to leave' " and that "a reasonable child subjected to police questioning will sometimes feel pressured to submit when a reasonable adult would feel free to go." (*Id.* at pp. 2402-2403.)

*J.D.B.*'s holding—that a juvenile's age is a factor in the reasonable-person analysis of Fifth Amendment custody—may implicate "other areas of criminal procedure—including voluntariness of waivers of rights and seizure inquiries" as well as areas of substantive criminal law, such as "blameworthiness of [the subject's] conduct and/or state of mind." (Levick & Tierney, *The United States Supreme Court Adopts a Reasonable Juvenile Standard in* J.D.B. v. North Carolina *for Purposes of the* Miranda *Custody Analysis: Can a More Reasoned Justice System for Juveniles Be Far Behind?* (2012) 47 Harv.C.R.-C.L. L.Rev. 501, 517, fn. 121.)  The holding seems particularly fitting for search-and-seizure analyses since the tests for custody under the Fifth Amendment and detentions under the Fourth Amendment both focus on how reasonable persons would perceive their interaction with the police.  (See *People v. Pilster* (2006) 138 Cal.App.4th 1395, 1403, fn. 2.)  And extending the holding to search-and-seizure cases would not be much of a stretch because the United States Supreme Court suggested long before it announced *J.D.B.* that a minor's age matters in evaluating whether the minor was seized.  (See *Kaupp v. Texas* (2003) 538 U.S. 626, 630-631 ["A 17-year-old boy was awakened in his bedroom at three in the morning by at least three police officers . . . . [¶] . . . [A] group of police officers rousing an adolescent out of bed in the middle of the night with the words 'we need to go and talk' presents no option but 'to go' "].)  As *J.D.B.* pointed out, " '[o]ur history is replete with laws and judicial

8

recognition' that children cannot be viewed simply as miniature adults." (See *J.D.B.*, at pp. 2403-2404.)[8]

Although we recognize the strength of the argument that *J.D.B.*'s holding should be extended to Fourth Amendment custody determinations, we need not resolve the issue here because we conclude that a reasonable person in J.G.'s position would not have felt free to go regardless of his or her age. We begin by accepting that Officer Woelkers's interaction with J.G. began as a consensual encounter. "Approaching a person, requesting to speak with him [and] asking for permission to search him . . . do not transform an otherwise consensual encounter into a detention." (*People v. Coulombe* (2000) 86 Cal.App.4th 52, 57, fn. 3.) Nor did Officer Woelkers's request for J.G.'s identification, name, and birthdate transform the encounter into a detention. (See *Hiibel v. Sixth Judicial District Court of Nevada, Humboldt County* (2004) 542 U.S. 177, 185 ["[i]n the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment"].) But the consensual encounter turned into a detention as Officer Woelkers's suspicions persisted without apparent reason, as the encounter became increasingly intrusive, as the minutes passed, and as the police presence and show of force grew. We conclude that by the time Officer Woelkers asked

---

[8] The Attorney General argues that accounting for age would create uncertainty and a slippery slope because the same principle "could be applied to other identifiable groups based on age, gender, and ethnicity" and "would require a police officer to adjust the test to each person that [the] officer encounters." But *J.D.B.* rejected the argument that accounting for a child's age would undermine the "clarity" provided by "the objective custody test." (*J.D.B.*, *supra*, 131 S.Ct. at p. 2407.) The Supreme Court pointed out that certain " 'commonsense conclusions about behavior and perception' "—including that "children 'generally are less mature and responsible than adults,' [citation]; that they 'often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them,' [citation]; and they 'are more vulnerable or susceptible to . . . outside pressures' than adults"—"apply broadly to children as a class," distinguishing a child's age "from other personal characteristics that, even when known to police, have no objectively discernible relationship to a reasonable person's understanding of his freedom of action." (*J.D.B.*, *supra*, 131 S.Ct. at pp. 2403-2404.) As *J.D.B.* makes clear, children are a special demographic whose characteristics may be considered without undermining the purposes of an objective evaluation from a reasonable person's standpoint.

J.G. to sit on the curb, a reasonable person in J.G.'s circumstances would not have felt free to end the encounter.

The Attorney General argues that asking, as opposed to directing, a person to sit on the curb does not normally constitute a detention. She relies on *People v. Cartwright*, *supra*, 72 Cal.App.4th 1362, which held that "a mere request, as opposed to a command directing the person's movements, does not constitute a Fourth Amendment restraint." (*Id.* at p. 1370; cf. *People v. Mendoza* (2011) 52 Cal.4th 1056, 1081-1082 [defendant was detained where officer ordered him to sit on the curb].) We accept that an officer's asking a person to sit on the curb, without more, does not generally constitute a detention. But *Cartwright* does not support the broad proposition that phrasing a statement as a request rather than a command necessarily prevents a detention from occurring. As *Cartwright* recognizes, if "the content or form of the question impart[s] any compulsion to comply," there may be a "basis for finding [the suspect] was under the kind of restraint associated with a Fourth Amendment detention." (*Cartwright*, at p. 1370; see also *In re Manuel G.*, *supra*, 16 Cal.4th at p. 821 [indicators that "compliance with the officer's request might be compelled" relevant to Fourth Amendment analysis].)

Here, the totality of the circumstances would have conveyed to a reasonable person—juvenile or adult—that he or she was not free to refuse the request. (See *In re Manuel G.*, *supra*, 16 Cal.4th at p. 821.) Most significantly, the request was made after Officer Woelkers had clearly conveyed to the brothers that he suspected them of unlawful activity. "[Q]uestions of a sufficiently accusatory nature may by themselves be cause to view an encounter as a nonconsensual detention[,] . . . and the degree of suspicion expressed by the police is an important factor in determining whether a consensual encounter has ripened into a detention." (*People v. Lopez* (1989) 212 Cal.App.3d 289, 292-293; see also *Wilson v. Superior Court* (1983) 34 Cal.3d 777, 790 [detention occurred where officer informed defendant that he believed defendant was " 'carrying a lot of drugs,' " italics omitted].) Officer Woelkers asked both J.G. and D.G. whether they had anything "illegal," conducted a records check, and searched them, including their pockets, while physically restraining them.

10

Furthermore, as the encounter continued and became increasingly intrusive, the police presence and show of force grew.  Ultimately, four uniformed officers and three patrol cars were on hand, and a weapon had been displayed.  Together, these factors indicate an unusually strong police presence for a supposedly casual interaction.  (See *United States v. Mendenhall* (1980) 446 U.S. 544, 555; *In re Manuel G.*, at p. 821.)

Under these circumstances, we conclude that Officer Woelkers's request that J.G. sit on the curb resulted in a detention.[9]  As a result, the ensuing search of the backpack violated the Fourth Amendment, and the juvenile court's denial of J.G.'s motion to suppress was therefore improper.

III.
DISPOSITION

The judgment is reversed with directions to grant the motion to suppress.

---

[9] An officer is not required to inform a suspect of his or her freedom to decline cooperation or to leave.  (See *United States v. Drayton* (2002) 536 U.S. 194, 202-204; *United States v. Mendenhall*, *supra*, 446 U.S. at p. 555.)  But if Officer Woelkers had told J.G. that he was free to decline to sit on the curb, any subsequent acquiescence on J.G.'s part would have strongly suggested that that he had not been detained.  (Cf. *People v. Profit* (1986) 183 Cal.App.3d 849, 879-800 [fact that federal agent "affirmatively advised the defendants on four occasions that they did not have to speak to him and were free to leave" supported conclusion that no detention occurred].)

11

_____
Humes, J.*

We concur:


_____
Ruvolo, P.J.


_____
Reardon, J.


* Presiding Justice of the Court of Appeal, First Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


*People v. J.G.* (A139869)

Trial Court:       San Francisco County Superior Court

Trial Judge:       Honorable Suzanne Ramos Bolanos

Counsel for Appellant:   Michael Allen, under appointment by the First District Appellate Project

Counsel for Respondent   Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Senior Assistant Attorney General, Rene A. Chacon, Supervising Deputy Attorney General, Ronald E. Niver, Deputy Attorney General, Masha A. Dabiza, Deputy Attorney General, Noel Walton, Certified Law Student