Filed 5/22/15  P. v. Taylor CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MAURICE TAYLOR,<br><br>    Defendant and Appellant. | D065427<br><br><br><br>(Super. Ct. No. SCD251611) |

APPEAL from a judgment of the Superior Court of San Diego County, Frederick Maguire, Judge.  Reversed with directions.

Stephen M. Vasil, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel and Laura A. Baggett, Deputy Attorneys General, for Plaintiff and Respondent.

Maurice Taylor brought two motions to suppress evidence on Fourth Amendment grounds before the magistrate at his preliminary hearing and in the trial court.  (Pen.

Code,[1] § 1538.5.) Both motions were denied. Thereafter, Taylor entered a guilty plea to one count of possession of phencyclidine (PCP) for sale. (Health & Saf. Code, § 11378.5.) Taylor was sentenced to three years in local custody pursuant to section 1170, subdivision (h)(1).

Taylor appeals challenging the denial of his motion to suppress evidence. (§ 1538.5, subd. (m).) He contends he was detained without reasonable suspicion. He also argues the police lacked probable cause to arrest him for being intoxicated in public, therefore the PCP found incident to arrest should have been suppressed.

The People contended in the trial court, and contend here that the contact of Taylor by police leading up to his arrest was a consensual encounter and not a detention. The People do not argue that there was reasonable suspicion to support a detention. Rather, the People argue that Taylor was not detained prior to police obtaining probable cause to arrest him.

Based on our review of the record, we are satisfied the circumstances of the police contact in this case, including the overwhelming police presence, the patrol cars parked askew with emergency lights activated, and the manner in which the "contact" was conducted would cause a reasonable person to believe he was not free to leave.

Accordingly, we will find a seizure occurred without reasonable suspicion and that the facts supporting the alleged probable cause to arrest were the product of the unlawful seizure. We will not address the sufficiency of the facts to establish probable cause to

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

arrest Taylor in light of our finding that they arose from an unlawful detention. We will vacate the judgment and remand with directions to grant the motion to suppress and to permit Taylor to withdraw his guilty plea.

## STATEMENT OF FACTS

We find the statement of facts in the respondent's brief accurately and succinctly sets forth the facts from the preliminary hearing in the light most favorable to the trial court's decision. We will incorporate that statement of facts here.

## STATEMENT OF FACTS

On October 10, 2013, around 11:00 p.m., San Diego Police Officer Oscar Amado was working on the crime suppression team for the Mid-City division of the police department.[2] The crime suppression team works in "hot spot" areas that maintain a high level of calls for police assistance and relate to gang activity and narcotics. This team has both uniformed officers and officers who work undercover in plain clothes. On this date, Officer Amado was wearing plain clothes and in an unmarked car. His duties consisted of reporting any suspicious activity he observed to uniformed officers.

Officer Amado was near the area of El Cajon Boulevard and the 4300 block of Winona Avenue. At this time, he observed appellant, and five to six other males and one female, loitering around some electrical boxes. At one point, appellant was sitting on the electrical boxes. While Amado did not observe anything that indicated to him that

---

2      Pursuant to section 1538.5, subdivision (i), the trial court's ruling on appellant's suppression motion was based on the evidence presented at the preliminary hearing.

3

appellant was involved in a crime, he requested the uniformed officers make contact with this group.

Sergeant Daniel Higdon was the first officer to arrive on scene. Higdon testified that this area is a high crime area and the officers assigned to this location mainly deal with narcotics and prostitution. Higdon arrived in his marked patrol car.

While he parked in the middle of the street because a car was already parked adjacent to the curb, the patrol car was not blocking the sidewalk. When he arrived, Sergeant Higdon did not have his lights or sirens activated. However, once he was forced to park in the middle of the street, Sergeant Higdon activated the lights to his patrol car.

Sergeant Higdon was alone. He observed a group of six people walking southbound on Winona Avenue -- an area with both business and residential properties. While there are streetlights on El Cajon Boulevard, once someone moves away from the intersection, it becomes dark. Sergeant Higdon approached the group, which began to dissipate. He spoke to some males and a female, but not appellant. Sergeant Higdon asked questions such as, "Hey, can I talk to you? Hey, got a second?" He never stated they were not free to leave, nor did he place anyone in handcuffs or in the back of his patrol car. While Sergeant Higdon did not make contact with appellant, he observed him and believed appellant was intoxicated.

Sergeant Adam Sharki arrived about 20 to 30 seconds after Sergeant Higdon. Sharki had training and experience regarding alcohol related offenses and he had previously made over 100 arrests for public intoxication, and 200 narcotics related arrests. Moreover, he had previously testified as an expert regarding methamphetamine

4

and PCP. Sharki testified that it was common practice to have multiple officers present if there are multiple subjects who need to be contacted. This practice supports officer safety and efficiency in the contact. Sharki parked his patrol car on the street, but this did not prevent the group of individuals from walking down the sidewalk in either direction, into the parking lot adjacent to the sidewalk, or a nearby apartment complex. At this time, no one was in handcuffs. Higdon made contact with the group, and Sharki stood by to ensure no one accessed a weapon, discarded evidence or fled.

Sergeant Sharki's attention was drawn to appellant because, first, he was physically the largest member of this group and, second, he was swaying when he stood, his eyes were glassy and watery, an odor emitted from his person, and he had slow slurred speech. Based on Sharki's training and experience, he believed appellant to be under the influence of alcohol or drugs or both. At this time, Sergeant Higdon was speaking to two or three individuals, and Sharki radioed for more officers to assist them. These officers arrived about 30 seconds later. Some of the individuals in the group asked why the officers were speaking to them. Sharki responded, "We get a lot of problems out here. We start talking to people who are out walking around. So relax. It is not a big deal."

Officer Kristopher McAndrew arrived. He also had training and experience regarding individuals who may be under the influence of drugs or alcohol. Officer McAndrew spoke to appellant. He noticed appellant was slow to respond to his questions and his eyes had dilated pupils and were glazed and bloodshot. Appellant was also swaying in a circular motion. Officer McAndrew asked appellant for identification. Appellant gave him his driver's license which identified a post office box as his place of

5

residence. Officer McAndrew asked appellant for his address, to which appellant became argumentative and responded that he lived at the place listed on his driver's license. Officer McAndrew attempted to explain to appellant that the address listed consisted of a post office box. Officer McAndrew spoke to appellant in a calm manner and did not place appellant in handcuffs. At this point, Officer McAndrew became concerned for appellant's safety because he believed appellant was so intoxicated that he would be unable to care for himself, might become a problem for others, or create a large disturbance. Moreover, Officer McAndrew was concerned appellant would be walking around a poorly lit area. This interaction lasted less than five minutes. Officer McAndrew never indicated to appellant that he was not free to leave, nor did appellant ask if he was free to leave. Officer McAndrew placed appellant under arrest for public intoxication. Officer David Valdez searched appellant incident to arrest. A glass vial was recovered which contained 15 milliliters of PCP. After Officer McAndrew left with appellant, the other individuals in the group reconvened and left.

On cross-examination, Officer McAndrew affirmed his report stated that he believed his duty was to detain appellant when he arrived on scene. However, he never communicated this thought to appellant. Also, the evidence revealed that in total about six or less officers were on scene that evening.

Finally, Police Officer Steve Skinner testified about his training and experience regarding narcotics and PCP specifically. Officer Skinner opined that 15 milliliters is a large amount of PCP because it represents about 150 doses, and would be worth between

$1,500 and $3,000.  Accordingly, Officer Skinner believed the glass vial was possessed for sale.

Defense Evidence

Defense counsel introduced a 10-second video which captured appellant walking down the sidewalk minutes before any contact with police.

DISCUSSION

The controlling issue in this case is whether Taylor was seized before the police developed the facts upon which they relied to arrest Taylor for being intoxicated in public.  The parties do not dispute what occurred.  Nor do they disagree that police can contact people without the person necessarily being detained, or seized.  Further they agree that police may not detain a person without reasonable suspicion that criminal activity may be afoot.  (*Terry v. Ohio* (1968) 392 U.S. 1.)  Thus we are required to decide if the record supports the trial court's finding the "contact" leading up to the arrest was a consensual encounter.  We conclude the record does not support that finding.

A.  Legal Principles

When we review a trial court's decision on a motion to suppress evidence we first consider the historical facts set forth in the record.  We must decide whether the trial court's factual findings are supported by applying the substantial evidence standard of review.  Once we determine the historical facts, we independently determine the legal consequences of those facts.  (*People v. Zamudio* (2008) 43 Cal.4th 327, 342.)

The standard for determining whether a person has been seized (detained) was established in *United States v. Mendenhall* (1980) 446 U.S. 544, 554 (*Mendenhall*).

7

There the court said: "We conclude that a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." (*Mendenhall, supra,* at p. 554; *People v. Valenzuela* (1994) 28 Cal.App.4th 817, 823.) The test for evaluating police conduct under the Fourth Amendment is an objective one. We examine the nature of the conduct and not the officer's subjective beliefs. (*People v. Castaneda* (1995) 35 Cal.App.4th 1222, 1227.)

As pointed out in *Mendenhall, supra,* 446 U.S. 544, the presence of multiple officers is a factor that can contribute to a finding a suspect has been detained. (*In re J.G.* (2014) 228 Cal.App.4th 402, 412-413.) The use of the emergency lights on a patrol car can be a circumstance that would indicate a person must yield to a showing of police authority. (*People v. Bailey* (1985) 176 Cal.App.3d 402, 405-406.)

We next consider whether the circumstances of the "contact" in this case objectively became a seizure.

### B. Analysis

When Officer Amado observed Taylor and several men and a woman standing on a public street after 11:00 p.m., he did not observe any criminal behavior. However, Amado directed patrol officers to make "contact" with the group.

8

The first officer to arrive was Sergeant Higdon. He stopped his car in the street because he had no other place to park. Higdon activated the patrol car's emergency lights. He then approached the group. Higdon's initial greeting was something like "Hey, can I talk to you?" Assessing the encounter at that point would not likely demonstrate a seizure of Taylor or the others in his group.

Within a few seconds another uniformed sergeant arrived and parked his car on the street, apparently with the emergency lights activated. Sergeant Sharki principally watched the group and called for even more patrol officers. Within seconds four more patrol officers arrived. The record is unclear as to how many more patrol cars arrived, where they parked or how many had their emergency lights on. The officers were deployed in an "L" shaped pattern around the suspects. The suspects were standing on a sidewalk in front of a closed business and a block wall. The police were in front of and around the group.

Officer McAndrew, one of the four additional patrol officers, believed it was his duty to detain Taylor, who was the largest person in the group, although McAndrew did not tell Taylor he was detained. McAndrew then asked Taylor for identification, which led to some fumbling by Taylor for his wallet and the discussion about residence, which formed part of McAndrew's probable cause.

The contact may well have started as merely that, a contact hoping for voluntary discussion. It may also be true that the decision to deploy six uniformed officers, multiple patrol cars in the street with emergency lights, and to array the officers in a "security formation" was all based on the sergeant's view of police protection. However,

9

just like McAndrew's subjective belief he was there to detain Taylor is not part of what a reasonable person in Taylor's position would know, it is also the case the citizen might not understand an immediate, substantial police presence was merely for officer safety. Indeed, we are at a loss to understand how a reasonable person, under these circumstances, would feel free to leave.

We recognize the police did not tell the group that they were not free to leave, or physically restrain them. However, the police not only made an overwhelming show of authority and by their numbers, and placement of officers communicated that the members of the group needed to stay and finish the "contact."

Like the court in *In re J.G., supra*, 228 Cal.App.4th at pages 412 to 413, we find this encounter started as a consensual contact, but as events dramatically escalated within minutes we cannot understand how any reasonable citizen would have felt free to attempt to leave. Thus we conclude the trial court erred in finding the events leading up to the arrest of Taylor were the product of a consensual encounter.

Given our conclusion Taylor was seized before police developed any potential probable cause for arrest, we decline to address the sufficiency of that probable cause determination. The PCP which forms the basis of the current charge was only found incident to the arrest, which under the circumstances of the case was unlawful.

## DISPOSITION

The judgment is vacated and the trial court's denial of the motion to suppress is reversed.  The court is directed to enter a new order granting the motion to suppress and to permit Taylor to withdraw his guilty plea if he wishes to do so.

HUFFMAN, Acting P. J.

WE CONCUR:

AARON, J.

IRION, J.

11