Filed 7/24/15  P. v. McKnight CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ROMAN DONNELL MCKNIGHT, JR.,<br><br>    Defendant and Appellant. | H041349<br>(Santa Clara County<br>Super. Ct. No. C1369248) |

Defendant Roman Donnell McKnight, Jr., appeals from a judgment of conviction entered after he pleaded no contest to possession of methamphetamine (Health & Saf. Code, § 11377, subd. (a)) and admitted that he had a prior strike conviction (Pen. Code, §§ 667, subds. (b)-(i), 1170.12).  Defendant contends that the trial court erred when it denied his motion to suppress evidence.  We find no error and affirm.

## I.  Statement of the Case

In November 2013, the Santa Clara District Attorney charged defendant with possession of methamphetamine with a prior strike conviction.  Defendant pleaded not guilty and denied the strike conviction.

At defendant's preliminary hearing on April 18, 2014, the magistrate heard defendant's suppression motion.  The motion was denied.  A few days later, the

prosecutor filed an information which charged the same offense and allegation. Defendant again pleaded not guilty.

In May 2014, defendant brought a motion to dismiss pursuant to Penal Code section 995 on the ground that the motion to suppress was improperly denied. The prosecutor filed opposition. Following a hearing, the motion was denied.

In June 2014, defendant pleaded no contest to the methamphetamine charge and admitted the prior strike conviction. At his sentencing hearing in August 2014, the trial court granted defendant's *Romero*[1] motion and placed defendant on probation for five years on condition, among other things, that he enter a substance abuse treatment program.

Defendant filed a timely appeal.


## II.  Statement of Facts

At approximately 10:50 p.m. on November 6, 2013, San Mateo County Sheriff's Deputies Alexander Gross and Ryan Hensel were on routine patrol. They were walking towards the light rail stop at the San Jose Diridon Station when they saw a group of four people, who were standing within a few feet of each other, on the platform. One of these individuals, Ricky Martinez, made eye contact with Deputy Gross, quickly turned around, ducked behind a kiosk, and quickly came back into sight. Deputy Gross thought that this behavior was suspicious and decided to contact Martinez. While Deputy Gross spoke with Martinez he overheard parts of Deputy Hensel's "casual and calm" conversation with the other three individuals:  defendant, Jacklyn Vitola, and a woman named Joubert.

As Deputy Gross spoke with Martinez, he observed symptoms which led him to believe Martinez was under the influence of a controlled substance. He decided to pat

---

[1]    *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*).

2

search Martinez and told him to turn around. When Deputy Gross tried to interlock Martinez's fingers, Martinez tried to pull away from his grip. Deputy Gross loudly told him to relax. At this point, Deputy Gross heard Deputy Hensel ask defendant, "[C]an you have a seat for a minute for me, man." Defendant was 10 to 15 feet away from Martinez. Deputy Gross took Martinez's wallet and handed it to Deputy Hensel. The officers then learned that Martinez and Vitola had outstanding warrants.

After Martinez and Vitola were arrested and placed in handcuffs, Deputy Gross walked in a "casual" manner toward defendant. The officers had been on the scene for five minutes at this point. Defendant was sitting on or against a kiosk. Deputy Gross did not obstruct defendant's movement, physically restrain him, or issue any commands. According to Deputy Gross, "I just wanted to talk to him and find out who he was since I wasn't sure if he was associated with the two people . . . I had just arrested." "[I]t was a very common conversational tone that my partner and I had with [defendant] and when I came over I thanked him for his time . . . it was pretty low key."

As Deputy Gross approached defendant, he noticed that defendant displayed signs of being under the influence of methamphetamine. Defendant was sweating and hyper-stimulated, and his muscles were spasming. Deputy Gross asked defendant for some identification, and defendant stated that his name was Joseph Mitchell and gave his birth date. The officer conducted a records check and found no match for this information. When Deputy Gross told defendant that there was no match, defendant put his head down and did not say anything.

Deputy Gross then asked defendant to stand up so that he could pat search him. According to Deputy Gross, individuals under the influence of a controlled substance can act irrationally and violent at times. He also wanted to determine if defendant had a wallet inside his pocket to assist him in identifying him. Defendant was wearing a large overcoat and baggie jeans, which Deputy Gross believed could have easily concealed a weapon.

3

After defendant stood up, Deputy Gross interlocked defendant's fingers behind his back and felt the outside of his clothing.  He noticed a package of blunt wraps in the front pocket of defendant's jacket.  The primary use of a blunt wrap is to roll marijuana inside of it for a marijuana cigar.  When Deputy Gross asked defendant if he had any marijuana, he replied that it was in his pocket.  After Deputy Gross asked if he had a medical marijuana card, defendant "mumbled something, incoherently."  The officer searched defendant's pockets, but did not find any marijuana.  When Deputy Gross put his finger in the front right coin pocket of defendant's jeans, defendant tried to break away from him.  Defendant ran several feet, but was stopped.  Deputy Gross arrested him for resisting and delaying his investigation.  The officer also seized a clear plastic baggie containing a usable amount of suspected methamphetamine from defendant's coin pocket.

## III.    Discussion

Defendant contends that the magistrate erred in denying his motion to suppress evidence.  He contends that he was unlawfully detained, and that, even if he was lawfully detained, the pat search violated his Fourth Amendment rights.

"Where, as here, a motion to suppress is submitted to the superior court on the preliminary hearing transcript, 'the appellate court disregards the findings of the superior court and reviews the determination of the magistrate who ruled on the motion to suppress, drawing all presumptions in favor of the factual determinations of the magistrate, upholding the magistrate's express or implied findings if they are supported by substantial evidence, and measuring the facts as found by the trier against the constitutional standard of reasonableness.'  [Citation.]  'We exercise our independent judgment in determining whether, on the facts presented, the search or seizure was reasonable under the Fourth Amendment.  [Citation.]'  [Citation.]" (*People v. Hua* (2008) 158 Cal.App.4th 1027, 1033.)

4

The Fourth Amendment, made applicable to the states through the due process clause of the Fourteenth Amendment, protects the individual against unreasonable searches and seizures. (*Mapp v. Ohio* (1961) 367 U.S. 643, 655-660.) When a police officer engages in conduct that violates the Fourth Amendment, the evidence obtained through such conduct is subject to the exclusionary rule. (*People v. Mayfield* (1997) 14 Cal.4th 668, 760, overruled on another ground in *People v. Scott* (2015) 61 Cal.4th 363, 391.)

"For purposes of Fourth Amendment analysis, there are basically three different categories or levels of police 'contacts' or 'interactions' with individuals, ranging from the least to the most intrusive. First, there are . . . 'consensual encounters' [citation], which are those police-individual interactions which result in no restraint of an individual's liberty whatsoever—i.e., no 'seizure,' however minimal—and which may properly be initiated by police officers even if they lack any 'objective justification.' [Citation.] Second, there are . . . 'detentions,' seizures of an individual which are strictly limited in duration, scope and purpose, and which may be undertaken by the police 'if there is an articulable suspicion that a person has committed or is about to commit a crime.' [Citation.] Third, and finally, there are those seizures of an individual which exceed the permissible limits of a detention, seizures which include formal arrests and restraints on an individual's liberty which are comparable to an arrest, and which are constitutionally permissible only if the police have probable cause to arrest the individual for a crime." (*Wilson v. Superior Court* (1983) 34 Cal.3d 777, 784.)

In determining whether an encounter between a police officer and an individual constitutes a detention, we note that a "seizure does not occur simply because a police officer approaches an individual and asks a few questions." (*Florida v. Bostick* (1991) 501 U.S. 429, 434 (*Bostick*).) For Fourth Amendment purposes, "a person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained." (*United States v. Mendenhall* (1980) 446 U.S. 544, 553.) "[T]o determine

5

whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." (*Bostick*, at p. 439.) "[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual [citations]; ask to examine the individual's identification [citations]; and request to search his or her luggage [citation]—as long as the police do not convey a message that compliance with their requests is required." (*Bostick*, at pp. 434–435.) "Circumstances establishing a seizure might include any of the following: the presence of several officers, an officer's display of a weapon, some physical touching of the person, or the use of language or of a tone of voice indicating that compliance with the officer's request might be compelled." (*In re Manuel G.* (1997) 16 Cal.4th 805, 821.) "The officer's uncommunicated state of mind and the individual citizen's subjective belief are irrelevant in assessing whether a seizure triggering Fourth Amendment scrutiny has occurred." (*Ibid.*)

Defendant contends that he "was 'seized' within the meaning of the Fourth Amendment when Deputy Hensel directed him to sit down, and two members of his group were handcuffed in his close vicinity." We disagree.

Here, two officers approached a group of four people. Neither officer displayed a weapon, physically touched anyone, or issued commands. While Deputy Gross spoke to Martinez, Deputy Hensel spoke to the others in a casual and calm manner. Deputy Hensel asked defendant, "[C]an you have a seat for a minute for me, man." Contrary to defendant's argument, Deputy Gross's seizure of Martinez, who was 10 to 15 feet away from defendant, by attempting to pat search Martinez did not result in a seizure of defendant. Deputy Hensel's conduct toward defendant did not indicate that compliance was required. Moreover, the subsequent arrests of Martinez and Vitola for outstanding arrests warrants also did not involve defendant. In considering the totality of the

6

circumstances, there was nothing in the officers' conduct which "would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." (*Bostick*, *supra*, 501 U.S. at p. 439.)

Defendant's reliance on *In re J.G.* (2014) 228 Cal.App.4th 402 (*J.G.*) is misplaced. In that case, Officer Woelkers approached a juvenile and his brother and asked if he could speak to them. (*Id.* at p. 405.) The juvenile answered, " '[Y]eah.' " (*Ibid.*) Less than a minute later, another officer arrived. (*Ibid.*) Officer Woelkers asked the brothers for identification, ran a records check, and conducted consensual pat searches while physically restraining them. (*Id.* at pp. 405-406.) Meanwhile, two more officers arrived, and one of the officers handed a rifle to one of the others. (*Id.* at p. 406.) At this point, Officers Woelkers asked the brothers to sit on the curb, which they did. (*Ibid.*) As they were sitting on the curb, Officer Woelkers obtained the juvenile's consent to search the juvenile's backpack and found a firearm. (*Ibid.*) About 10 or 15 minutes passed between the officer's first contact with the brothers and the juvenile's arrest. (*Ibid.*) The Court of Appeal held that the officer's interaction with the juvenile began as a consensual encounter, but "turned into a detention as Officer Woelkers's suspicions persisted without apparent reason, as the encounter became increasingly intrusive, as the minutes passed, and as the police presence and show of force grew. We conclude that by the time Officer Woelkers asked [the juvenile] to sit on the curb, a reasonable person in [his] circumstances would not have felt free to end the encounter." (*Id.* at p. 411.) *J.G.* is distinguishable from the present case. Here, when defendant was asked to sit down, he had not been asked increasingly intrusive questions, had not had a records check conducted, and had not been subjected to a strong police presence, including an officer holding a rifle.

Defendant next contends that the pat search violated his Fourth Amendment rights.

A police officer may conduct a pat down search during an investigation "where [the officer] has reason to believe that he is dealing with an armed and dangerous

individual . . . . [T]he issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." (*Terry v. Ohio* (1968) 392 U.S. 1, 27 (*Terry*).) A *Terry* frisk, a limited exception to the probable cause requirement (*Ybarra v. Illinois* (1979) 444 U.S. 85, 93-94), "is a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly." (*Terry,* at p. 17.) "[I]n determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." (*Terry,* at p. 27.)

Though the wearing of baggy clothing, standing alone, does not justify a pat down search (*People v. Collier* (2008) 166 Cal.App.4th 1374, 1377, fn. 1), here, there were additional factors establishing that the officer acted reasonably. It was late at night and defendant exhibited symptoms of being under the influence of methamphetamine. He was sweating and hyper-stimulated, and his muscles were spasming. The officer's training and experience gave him reason to be concerned about potential violence from someone under the influence of methamphetamine. He also had reason to believe that defendant had just falsely identified himself. Under these circumstances, Officer Gross acted reasonably.

The cases upon which defendant relies do not persuade us otherwise. In *State v. Setterstrom* (2008) 163 Wash.2d 621, the police received an anonymous call that an individual who appeared to be under the influence of drugs was in the lobby of the welfare department. (*Id.* at p. 623.) When the police arrived, they found the defendant, who was nervous and fidgeting. (*Id.* at p. 624.) In response to questioning, he lied about his name. (*Ibid.*) The Washington Supreme Court held that the officer was not justified in pat searching the defendant. (*Id.* at pp. 627-628.) In contrast to *Setterstrom*, here, there were two additional factors: defendant was wearing baggy clothing, and the

8

encounter occurred late at night. In *Sibron v. New York* (1968) 392 U.S. 40, the United Supreme Court held that the defendant's act of talking with narcotic addicts did not justify a pat search for weapons. (*Id.* at p. 64.) However, as previously stated, additional factors provided a reasonable belief that the individual was armed and dangerous.

## IV. Disposition

The judgment is affirmed.

                                              _____

                                              Mihara, J.

WE CONCUR:

_____
Bamattre-Manoukian, Acting P. J.

_____
Márquez, J.