Filed 8/27/15  In re Richard C. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  The opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| In re RICHARD C., a Person Coming Under the Juvenile Court Law.<br>_____ | G051057 |
| THE PEOPLE, | (Super. Ct. No. DL049876) |
| Plaintiff and Respondent, | O P I N I O N |
| v. |  |
| RICHARD C., |  |
| Defendant and Appellant. |  |

Appeal from a judgment of the Superior Court of Orange County, Lewis W. Clapp, Judge.  Affirmed.

Sheila Quinlan, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Daniel Hilton, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

Minor Richard C. admitted committing a shoplifting offense (Pen. Code, § 459.5) after the juvenile court denied his motion to suppress evidence (Welf. & Inst. Code, § 700.1). The juvenile court did not declare Richard to be a ward, but placed him on unsupervised probation on various conditions (Welf. & Inst. Code, § 725, subd. (a)). Richard contends a police officer detained him in violation of his Fourth Amendment rights. We affirm.

I

FACTUAL AND PROCEDURAL BACKGROUND

Officer Brian Thaete of the Orange Police Department testified at the suppression hearing that on June 16, 2014, around 5:00 p.m. he was patrolling in a high crime area a few blocks from a Best Buy electronics store. Thaete was in uniform and driving a marked patrol car. The area suffered from auto burglaries, thefts, and shoplifting.

Thaete spotted 15-year-old Richard C. riding a skateboard and a male companion, O., on a bicycle. They were in the street travelling away from the Best Buy location.

Thaete stopped his car about 15 feet from the boys, got out, and asked if he could speak with them. The officer did not activate his spotlights, overhead lights, or sirens, nor did he display a weapon. The boys stopped and "willingly spoke with" Thaete. He asked if they were from the neighborhood, what they were doing, and if either was on probation or parole. Richard said he was not, but that O. was on probation. Thaete looked directly at O. and told him to sit on the curb. Richard elected to sit next to O. even though Thaete did not tell him to do so. Thaete did not tell Richard he was free to leave, and Richard did not ask if he could leave.

O. denied he had anything illegal in his backpack. Thaete searched the bag and found a cell phone screen protector in its packaging. When Thaete asked O. about the screen protector, Richard and O. both responded simultaneously. O. claimed he got

or bought it at the store, but Richard said it came from his cousin's house. Richard, however, could not provide an address for his cousin and his description of the general location of his cousin's house did not correspond with a residential area. Thaete asked if they could go to the cousin's home, but Richard claimed his cousin had just departed.

Thaete then asked Richard if he had anything illegal in his backpack. Richard said he did not, and opened his bag and began pulling items out. He extracted a Bluetooth minispeaker, component wires or cables, and instructions. The minispeaker appeared new but was unpackaged. The cables were packaged. Thaete found it suspicious that "there was no packaging for the item itself, yet the components to it were still in [the] packaging." Thaete had seen this before in stolen property cases, explaining thieves "essentially take it out of the packaging because that's where the [anti-theft] sensors are" and discard the packaging inside the store so alarms are not triggered. Richard claimed his cousin also gave them the minispeaker.

Thaete searched O. and found an eight gigabyte flash drive in his pocket and a phone case clipped on his belt. O. admitted these items were stolen. By this point another officer had arrived. One of the officers handcuffed the boys, and Thaete took the items to Best Buy, where he spoke with a store manager and learned the items had been stolen. Store video footage showed the boys taking items off the shelf, going off camera, and leaving the store without making a purchase. Thaete drove back to where another officer was detaining the youths and placed them under arrest.

Richard testified Thaete parked his car at an angle so that it would have been a "tight squeeze" to maneuver around it. Thaete got out of his car and said "he needed to talk to" them. Richard got off his skateboard. Thaete told them to "stand on the side of the curb" and then asked if they were on probation. After O. said he was on probation, Thaete looked at both of them and said "I need you two to sit down." Thaete searched O. and asked where he got the screen protector. Richard stated he initially did all the talking and told Thaete the screen protector came from his cousin's house. At

3

some point, Thaete asked Richard if he had anything in his pockets or anything illegal in his backpack. Richard said no, showing Thaete the contents of his backpack. Thaete did not tell him to open the backpack or show him the contents. After Thaete returned from Best Buy, O. stated the screen protector came from the store.

The juvenile court denied the motion, finding no detention occurred until Richard and O. made conflicting statements concerning the acquisition of the screen protector.

II

DISCUSSION

*No Illegal Detention Occurred*

Richard contends the officer detained him without reasonable suspicion. Specifically, he argues "the totality of the circumstances would have conveyed to a reasonable person, especially a reasonable person of Richard's youth, that he was not free to leave Officer Thaete's presence. [] Richard was detained when Officer Thaete drove directly in Richard's path of travel and immediately asked him, a 15-year-old youth, if he was on probation or parole. The distance between the parked patrol car and the approaching minors was fifteen or twenty feet, approximately one or one and a half car lengths. By approaching the two minors who were traveling by bike and skateboard and stopping just a car length or so in front of them, the officer effectively blocked the minors from continuing on their path. Immediately after blocking their path, the officer asked if he could speak with them and then proceeded to inquire pointedly if the minors were on probation or parole. In this case, Officer Thaete's quick and close approach directly in the 15-year-old's path of travel along with the immediate probing question about the minor's presumed criminal status constituted a 'show of authority so intimidating as to communicate to any reasonable person that he or she was not free to decline his requests or otherwise terminate the encounter.'"

4

"An officer may approach a person in a public place and ask if the person is willing to answer questions. If the person voluntarily answers, those responses, and the officer's observations, are admissible in a criminal prosecution. [Citations.] Such consensual encounters present no constitutional concerns and do not require justification. [Citation.] However, 'when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen,' the officer effects a seizure of that person, which must be justified under the Fourth Amendment to the United States Constitution. [Citations.] In situations involving a show of authority, a person is seized 'if "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave,"' or '"otherwise terminate the encounter,"' [citation], and if the person actually submits to the show of authority [citation].'" (*People v. Brown* (2015) ___ Cal.4th ___, ___ [2015 LEXIS 5404].) An officer may not detain a person unless the officer can "'point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that [Brown] may be involved in criminal activity. [Citations.]'" (*Ibid.*)

We consider all circumstances surrounding the encounter, including the officer's verbal and nonverbal actions, to determine whether the conduct would have communicated to a reasonable person he was not free to decline the officers' requests or otherwise terminate the encounter. (*In re Manuel G.* (1997) 16 Cal.4th 805, 820-821 [relevant factors include the presence of several officers, an officer's display of a weapon, some physical touching of the person, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled].) In reviewing the trial court's suppression ruling, we defer to its factual findings if supported by substantial evidence. We independently assess the legal question of whether the challenged search or seizure satisfies the Fourth Amendment. (*People v. Leyba* (1981) 29 Cal.3d 591, 596-597.)

Richard relies on several cases. In *People v. Garry* (2007) 156 Cal.App.4th 1100, the court concluded a detention occurred when a uniformed officer parked his patrol car next to the defendant, shone his spotlight on him, and proceeded to rapidly walk toward him while asking a series of questions, including whether he was on probation or parole. The court found the officer's actions would have intimidated any reasonable person: "[A]fter only five to eight seconds of observing defendant from his marked police vehicle, [the officer] bathed defendant in light, exited his police vehicle, and, armed and in uniform, 'briskly' walked 35 feet in 'two and a half, three seconds' directly to him while questioning him about his legal status. Furthermore, [the officer] immediately questioned defendant about his probation and parole status, disregarding defendant's indication that he was merely standing outside his home. In other words, rather than engage in a conversation, [the officer] immediately and pointedly inquired about defendant's legal status as he quickly approached." (*Id.* at pp. 1111-1112.) The court found a "detention occurred despite the fact that [the officer] did not make any verbal commands. 'It is not the nature of the question or request made by the authorities, but rather the manner or mode in which it is put to the citizen that guides us in deciding whether compliance was voluntary or not.' [Citation.] No matter how politely [the officer] may have stated his probation/parole question, any reasonable person who found himself in defendant's circumstances, suddenly illuminated by a police spotlight with a uniformed, armed officer rushing directly at him asking about his legal status, would believe themselves to be 'under compulsion of a direct command by the officer.' [Citation.] [The officer's] actions set an unmistakable 'tone,' albeit largely through nonverbal means, 'indicating that compliance with the officer's request might be compelled.' [Citation.]" (*Id.* at p. 1112.)

In *In re J.G.* (2014) 228 Cal.App.4th 402 (*J.G.*), a uniformed officer parked his patrol vehicle and approached the 15-year-old minor J.G. and his brother D.G. He asked the brothers if he could speak to them, and J.G. responded, "[Y]eah." (*Id.* at p.

6

405.)  The officer made casual conversation and asked the brothers what they were up to. J.G. said they were going to a party.  About a minute later, another officer arrived and stood about five to seven feet away from the first officer, who then asked D.G. for identification.  D.G. gave him a Honduran identification card, and a records check revealed no California driver's license or identification card had been issued to him.  The officer then asked J.G. if he had any identification, and J.G. responded, "[N]o."  J.G. gave the officer his name and birth date so the officer could run a records check.  (*Id.* at p. 406.)  The officer asked D.G. if he had anything illegal on his person, and D.G. said he did not.  D.G. agreed to let the officer search his person, which turned up nothing illegal. The officer asked J.G. if he had anything illegal on his person.  J.G. said he did not, and agreed to let the officer search him.  The officer placed J.G.'s hands behind his back as he searched J.G.  He found nothing illegal.  Meanwhile, two more officers arrived, totaling four uniformed officers and three marked patrol cars. The first officer "asked" the brothers to sit on the curb.  They complied.  J.G. agreed to let an officer search his backpack, resulting in the discovery of a pistol.  About 10 or 15 minutes had passed since the first officer initiated contact with the brothers.  (*J.G.*, *supra*, at pp. 405-407.)

The appellate court concluded the encounter had ripened into a detention by the time the officer asked J.G. to sit on the curb.  (*J.G., supra,* 228 Cal.App.4th at p. 411.) The court explained the officer conveyed to the brothers he suspected them of unlawful activity by posing numerous accusatory questions, which "'"may by themselves be cause to view an encounter as a nonconsensual detention."'" (*Id.* at p. 412.)  The court also noted the encounter grew more intrusive as four other officers arrived on the scene, an "unusually strong police presence for a supposedly casual interaction." (*Ibid.*)

Here, viewing the evidence in a light most favorable to the juvenile court's ruling, and accepting for present purposes Richard's argument the court should consider youthfulness in evaluating whether a reasonable person would feel free to end an encounter, we conclude the totality of the circumstances did not convey to a reasonable

7

15-year-old he was not free to leave, at least until Richard and O. responded simultaneously and provided conflicting stories concerning the origin of the screen protector. Thaete did not shine a spotlight on Richard or run toward him. The officer did not ask a series of accusatory questions or block Richard's path of travel. The officer "asked" if he could talk to the boys, told only O., who was on probation, that he needed to sit down, and directed most, if not all, his attention to O. until the boys made conflicting statements about the screen protector. A backup officer arrived after Richard and his friend provided Thaete the basis to detain them for further investigation. (See *People v. Franklin* (1987) 192 Cal.App.3d 935, 940 [the officer put his patrol car's spotlight on the defendant and stopped his car directly behind him; no detention because the officer did not block the defendant's way, directed no verbal requests or commands to him, and did not alight immediately from his car and pursue the defendant; "such directed scrutiny does not amount to a detention."].)

The facts here are fairly close to those in *People v. Bennett* (1998) 68 Cal.App.4th 396. There, a police officer saw the defendant talking to a prostitute who had just offered sex for money to an undercover officer. (*Id.* at p. 399.) The officer approached the defendant and asked, "'Can I talk to you for a moment?'" He replied, "'Yes.'" The officer inquired whether the defendant was on parole and he admitted he was under parole supervision. The appellate court found the encounter was consensual because the officer spoke in a polite, conversational tone and applied no physical or verbal force that might have caused a reasonable person to feel compelled to respond. (*Id.* at pp. 402-403.)

Accordingly, we find the juvenile court did not err when it concluded the officer did illegally detain the minor.

## III

### DISPOSITION

The judgment is affirmed.


ARONSON, J.

WE CONCUR:


O'LEARY, P. J.


FYBEL, J.