Filed 8/24/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re T.F.-G., a Person Coming Under the Juvenile Court Law. | H050112 <br> (Santa Clara County <br> Super. Ct. No. 21JV45239A) |
| THE PEOPLE, <br><br>     Plaintiff and Respondent, <br><br>     v. <br><br> T.F.-G., <br><br>     Defendant and Appellant. | |

In the midst of a group contacted by officers for smoking cannabis on the street, 16-year-old T.F.-G. witnessed first one and then another of his companions be restrained, searched, and made to sit on the curb as the officers worked their way through the group. Rather than submit in turn when the officers turned their attention to him, T.F.-G. ran. Chased, tackled, and punched, he was arrested for resisting or delaying a peace officer (Pen. Code, § 148, subd. (a)).[1]  In a search incident to that arrest, the police found a loaded handgun in his pocket, which T.F.-G. was not licensed to carry.

On appeal, T.F.-G. raises two constitutional challenges asserting the infringement of individual rights guaranteed by the Fourth and Second Amendments.

---

[1] Undesignated statutory references are to the Penal Code.

The first constitutional challenge is personal to him and specific to his circumstances, turning on the existence of probable cause for his arrest for resisting or delaying a peace officer—the asserted basis for the eventual search that revealed his possession of a loaded handgun in public. Because the alleged resistance was T.F.-G.'s flight from officers intent on detaining him, the prosecution's burden was to prove that a reasonable person in T.F.-G.'s position would have understood he was not free to leave. The totality of the circumstances on this record satisfies that burden.

T.F.-G.'s second constitutional challenge transcends the personal or particular. In a facial challenge to the prohibition on the unlicensed public carrying of loaded firearms (§ 25850), he does not dispute a state's general authority to limit the public carrying of loaded firearms to those it has licensed to do so, nor does he contend that all of the state's conditions for licensure are unconstitutional; instead, he targets the statutory provision that permits the prosecution of any unlicensed person carrying a loaded firearm in public, irrespective of the reason for their unlicensed status.

Given the breadth of T.F.-G's facial challenge, *New York State Rifle & Pistol Association, Inc. v. Bruen* (2022) 597 U.S. ___ [142 S.Ct. 2111] (*Bruen*) does not avail him. Although California's "good cause" licensing requirement is undisputedly unconstitutional under *Bruen*, the unconstitutionality of a discrete licensing requirement does not render section 25850 facially unconstitutional. We therefore affirm.

## I.    BACKGROUND

### A.    *The Arrest and Search*[2]

On the afternoon of June 13, 2021, two uniformed San Jose police officers—Jason Villaruz and Joseph Ferrante—were traveling in an unmarked police car near the intersection of Gridley Street and Percivale Drive when they came upon a group of five

---

[2] We take these facts from the evidence the juvenile court admitted in hearing the suppression motion.

2

people in and around a red Ford Mustang parked curbside.  Smelling what they described as "[f]reshly burnt" marijuana or "marijuana being smoked" emanating from the group through the open windows of the police car on an otherwise unoccupied street, the officers stopped to investigate the smell.

The officers parked their car in the lane of traffic near the group, then approached on foot.  Villaruz began with the individuals on the sidewalk.  Identifying themselves as San Jose police officers, Villaruz asked the group if they were " 'just hanging out smoking weed.' "  Some in the group responded in the affirmative.  Villaruz made a brief initial contact with T.F.-G., during which he neither told T.F.-G. that he was under detention nor that he was free to go before moving on to contact other members of the group.

Ferrante's initial focus was on the two young men in the Mustang.  Ferrante, "familiar with [T.F.-G.'s] family, his father, his older brother, and him," recognized T.F.-G. sitting in a chair next to the car and T.F.-G.'s older brother "rolling a marijuana joint" in the car's passenger seat.  Ferrante adopted a congenial tone with the car's occupants but told T.F.-G.'s brother, "You wanna put it out" and asked the driver (later identified only as "Alex") whether there was "anything other than weed in the car."[3]  After asking the question, Ferrante directed Alex to "come out of the car real quick" and asked if Alex had anything on him that "could hurt me."  Ferrante proceeded to pat-search Alex, using one hand to secure Alex's hands together while using the other to rummage over his outer clothing.  As Ferrante "escorted" Alex by the arm to the sidewalk and "told him to sit on the curb," he directed E.L., a second member of the group who was standing in front of the Mustang, to turn around; Ferrante then searched E.L. in the same manner that Ferrante had searched Alex.  When E.L. asked the reason for this law

[3] The trial court admitted the officers' body-worn camera footage into evidence. Our video references are to that footage.

3

enforcement attention, Ferrante did not respond. After completing the pat search, Ferrante directed E.L. to sit on the curb, next to Alex.

While E.L. was proceeding to the curb, Ferrante saw T.F.-G. and said, "Mr. [G.], how you doin', bud, it's been a minute." The following exchange ensued.

Ferrante: "Can you come over here for a minute?"

T.F.-G.: "For what?"

Ferrante: "Huh?"

T.F.-G.: "For what?"

Ferrante: "Just come over here."

T.F.-G.: "For what?"

Ferrante: "Because I asked you to. Don't make this . . ."

As Ferrante was beginning to say, "Don't," T.F.-G. took off at a sprint down the street.[4]

At the suppression hearing, Ferrante testified that T.F.-G. "would have been the next one to contact and then have a seat." Although he phrased the directive to "come over here" as a request, Ferrante did not intend T.F.-G to have the option of leaving or refusing; Ferrante only used the form of a request because, to avoid escalation, he "tr[ies] not to give demands" when officers are outnumbered.

Villaruz caught T.F.-G., tackled him to the ground, then punched him in the right eye. T.F.-G. cried out as Villaruz commanded, "Stop! On the *fucking* ground man! Don't *fucking* run! Hands behind your *fucking* back!" while a woman off camera protested, "Don't hit him like that!" (Emphasis in original.) Villaruz handcuffed T.F.-G. and performed a "quick" search, which included removing and inspecting all contents of

---

[4] T.F.-G.'s brother simultaneously fled in the opposite direction. Although he was not pursued, T.F.-G.'s brother later returned to the scene, apparently of his own accord.

T.F.-G.'s jeans pockets. Villaruz then sat T.F.-G. against a truck, warning that he would punch T.F.-G. in the face if he moved.[5]

Later, when putting T.F.-G. in a patrol car for transport, Villaruz searched T.F.-G. a second time.[6] This time, Villaruz found a loaded unregistered handgun in the right pocket of the basketball shorts T.F.-G. was wearing under his jeans.

**B.    *Procedural History***

Two days after T.F.-G.'s arrest, the Santa Clara County District Attorney petitioned the juvenile court to declare T.F.-G. a ward of the juvenile court pursuant to Welfare and Institutions Code section 602, subdivision (a). The District Attorney alleged as grounds for wardship T.F.-G.'s commission of the following offenses: (1) carrying a loaded firearm not registered to him (§§ 11106, 25850); (2) carrying a concealed firearm (§25400, subd. (a)(2)); (3) minor in possession of a firearm capable of being concealed upon the person (§ 29610); and (4) resisting, delaying, or obstructing an officer, a misdemeanor (§ 148, subd. (a)(1)).

Several months after the initiation of wardship proceedings, T.F.-G. moved to suppress the firearm and other evidence, on the ground that law enforcement had violated

---

[5] The body-worn camera footage from the incident shows two later exchanges with T.F.-G., in which Villaruz states that he punched T.F.-G. in the eye "because [T.F.-G.] ran[,]" thereby "disrespect[ing]" Ferrante and, by extension, Villaruz himself. In his incident report, however, Villaruz wrote that he punched T.F.-G. "to provide . . . the time and opportunity to gain control of [T.F.-G.'s] hands," for officer safety. Concern for officer safety, Villaruz wrote, warranted punching the minor, because the officer's training and experience led him to anticipate as early as the chase that T.F.-G. might have a firearm. Though not central to our determination of whether probable cause supported the arrest, we note that nothing in the body-worn camera footage explains Villaruz's decision to punch T.F.-G. in the eye, or the discrepancy between the officer's comments at the scene and his later report, or the discovery of a firearm on T.F.-G.'s person only during transport.

[6] The parties do not dispute that T.F.-G. by this point was under arrest. Villaruz considered T.F.-G. to be under arrest for delaying the investigation by fleeing.

5

his Fourth Amendment rights in searching him. Following an evidentiary hearing, the juvenile court issued a written order denying T.F.-G.'s motion.

At the jurisdictional hearing, T.F.-G. admitted the violation of section 25850, subdivision (a) (count 1)—which the court found to be a felony—and the misdemeanor violation of section 148, subdivision (a)(1) (count 4). The court dismissed the remaining counts.

At the dispositional hearing, the juvenile court adjudged T.F.-G. a ward of the court and placed him on probation. As one consequence of the wardship adjudication, T.F.-G. "shall not own, or have in possession or under custody or control, a firearm until [he] is 30 years of age." (§ 29820, subd. (b).) T.F.-G. timely appealed.

## II.  DISCUSSION

### A.  *Motion to Suppress*

" 'The Fourth Amendment to the federal Constitution prohibits *unreasonable* searches and seizures.' " (*People v. Fayed* (2020) 9 Cal.5th 147, 182 (*Fayed*); see also *People v. Williams* (1999) 20 Cal.4th 119, 125-126.) Absent a search warrant, "a search is reasonable only if it falls within a specific exception to the warrant requirement." (*Riley v. California* (2014) 573 U.S. 373, 382.) Incident to a lawful arrest, for example, " 'it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape.' " (*Id.* at p. 383; see also *Fayed*, *supra*, 9 Cal.5th at p. 182.)

T.F.-G. argues that the juvenile court erred in denying his motion to suppress because he was not searched incident to a lawful arrest as the officers lacked probable cause to believe that he was resisting or delaying the lawful performance of their duties, in violation of section 148, subdivision (a). T.F.-G.'s flight, under this theory, was no more than his exercise of freedom to terminate what was purely a consensual encounter with law enforcement. Because the record establishes that T.F.-G. was resisting what a reasonable person would have recognized as Ferrante's attempt to detain him, Villaruz

had probable cause to arrest him.  We therefore reject T.F.-G.'s challenge to the lawfulness of the search incident to that arrest.

### 1.    *Consensual Encounters, Detentions, and Section 148*

" 'Police contacts with individuals may be placed into three broad categories ranging from the least to the most intrusive:  consensual encounters that result in no restraint of liberty whatsoever; detentions, which are seizures of an individual that are strictly limited in duration, scope, and purpose; and formal arrests or comparable restraints on an individual's liberty.  [Citations.]' " (*People v. Linn* (2015) 241 Cal.App.4th 46, 57 (*Linn*).)  Unlike consensual encounters, "[a] detention . . . is a seizure, albeit a limited one, for which reasonable suspicion is required." (*Ibid.*; see also *People v. Brown* (2015) 61 Cal.4th 968, 981 (*Brown*).)

"A person is seized by the police . . . when the officer, ' "by means of physical force or show of authority," ' terminates or restrains [the person's] freedom of movement, [citation], 'through means intentionally applied.' " (*Brendlin v. California* (2007) 551 U.S. 249, 254, italics omitted (*Brendlin*).)  In distinguishing a detention from a consensual encounter, "a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officer's requests or otherwise terminate the encounter." (*Florida v. Bostick* (1991) 501 U.S. 429, 439 (*Bostick*); see also *Brown*, *supra*, 61 Cal.4th at p. 980; *People v. Tacardon* (2022) 14 Cal.5th 235, 241-242, 252 (*Tacardon*).)

One who flees an officer's lawful attempts to detain violates section 148, subdivision (a)(1).[7]  (See *People v. Allen* (1980) 109 Cal.App.3d 981, 985-987; *People v.*

---

[7] Section 148, subdivision (a)(1) provides in relevant part, "Every person who willfully resists, delays, or obstructs any . . . peace officer . . . in the discharge or attempt to discharge any duty of his or her office" commits a misdemeanor punishable "by a fine

*Lopez* (1986) 188 Cal.App.3d 592, 601-602; see also *In re Gregory S.* (1980) 112 Cal.App.3d 764, 777-778; *In re Muhammed C.* (2002) 95 Cal.App.4th 1325, 1329 (*Muhammed C.*) [collecting cases].)  The elements of the offense are: " ' "(1) the defendant willfully resisted, delayed, or obstructed a peace officer, (2) when the officer was engaged in the performance of his or her duties, and (3) the defendant knew or reasonably should have known that the other person was a peace officer engaged in the performance of his or her duties." ' "  (*Yount v. City of Sacramento* (2008) 43 Cal.4th 885, 894-895; see also *In re Chase C.* (2015) 243 Cal.App.4th 107, 113; *Garcia v. Superior Court* (2009) 177 Cal.App.4th 803, 818.)  " ' "[T]he lawfulness of the officer's conduct is an essential element of the offense" ' of resisting a police officer" because the police officer is not engaged in " 'duties' " if the officer is engaged in unlawful conduct.  (*People v. Fuentes* (2022) 78 Cal.App.5th 670, 676.)

    **2.**    ***Standard of Review***

    On a motion to suppress, once the accused has established that the search or seizure was without a warrant, "the burden is on the prosecution to prove evidence seized . . . falls within a recognized exception" to the warrant requirement—here, that T.F.-G. was lawfully arrested on probable cause to believe he resisted a lawful detention.  (See *Fayed*, *supra*, 9 Cal.5th at p. 182.)  "Thereafter, a defendant can respond by pointing out any inadequacies in that justification for warrantless search."  (*Ibid*.)

    On appeal, our standard of review is well established:  "We defer to the trial court's findings, express or implied, where supported by substantial evidence.  In determining whether . . . the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment."  (*People v. Glaser* (1995) 11 Cal.4th 354, 362; *In re Lennies H.* (2005) 126 Cal.App.4th 1232, 1236 [applying same

---

not exceeding [$1,000], or by imprisonment in a county jail not to exceed one year, or by both that fine and that imprisonment."

standard in juvenile proceedings under Welf. & Inst. Code § 700.1]; *In re Trinidad V.* (1989) 212 Cal.App.3d 1077, 1079, fn. 1.)

### 3. *T.F.-G.'s Flight as a Violation of Section 148*

T.F.-G. contends that the police officers had not detained or attempted to detain him before he fled and that he consequently[8] was not lawfully arrested pursuant to section 148, rendering unlawful the search of his basketball shorts incident to the arrest. The totality of the circumstances persuades us that when T.F.-G. fled, " ' " 'a reasonable person would have believed that he was not free to leave,' " or " 'otherwise terminate the encounter.' " ' " (See *Tacardon*, *supra*, 14 Cal.5th at p. 241; see also *Bostick*, *supra*, 501 U.S. at p. 439.) Having observed the events unfolding around him, a reasonable person in T.F.-G.'s position would have understood that the request to go to the officer was mandatory. By the time T.F.-G. fled, the officers were at least attempting to detain him. The officers therefore had probable cause to believe that T.F.-G. violated section 148.[9] (See *Muhammed C.*, *supra*, 95 Cal.App.4th at p. 1329.)

---

[8] On appeal, T.F.-G. does not dispute that the police officers could have lawfully detained him—that is, that the police officers had a reasonable suspicion that he was committing or had just committed a crime. (See *Linn*, *supra*, 241 Cal.App.4th at p. 57.) We note that, subject to specified exceptions, smoking marijuana in public and possessing marijuana under the age of 21 are unlawful. (See Health & Saf. Code, §§ 11357, subd. (a), 11362.3, subd. (a).)

[9] The juvenile court viewed the crux of the parties' dispute as whether law enforcement was justified in detaining T.F.-G., not the antecedent question of whether T.F.-G. was detained. Although the court implicitly determined that the officers detained T.F.-G. before he fled, it articulated no factual findings underlying this conclusion. Nevertheless, the court relied on bodycam footage that, in its words, "clearly documented" the interaction between T.F.-G. and law enforcement. T.F.-G. has not suggested that there are any unaddressed factual questions to be resolved in the juvenile court, nor do we discern any. (See, e.g., *Tacardon*, *supra*, 14 Cal.5th at pp. 253-256 [remand for new factual finding required where magistrate expressly endorsed improper relevance argument pursuant to which it failed to consider and resolve a relevant factual dispute].)

Our conclusion is grounded in the efficient and unmistakable escalation in the officers' intrusion into the group's affairs. At the outset, stopping the car mid-lane to approach the group on foot suggested an interest in more than a casual exchange of pleasantries, even if this alone was not coercive. The officers' inquiry as to a potential cannabis offense then alerted the group that it was "the focus of the officer[s'] particularized suspicion." (*Wilson v. Superior Court* (1983) 34 Cal.3d 777, 791; see *id*. at p. 790; see also *In re J.G.* (2014) 228 Cal.App.4th 402, 412 (*J.G.*) [ascribing particular significance to the fact that officers had "clearly conveyed" that they suspected individuals of unlawful activity].) Although the drug offense was minor, it was nonetheless an occasion for the bodily seizure of first one and then another of T.F.-G.'s associates: Ferrante secured their hands, patted down their bodies, and directed them to sit on the curb so that he could turn to the next member of the group—all in T.F.-G.'s plain view. (Cf. *Tacardon*, *supra*, 14 Cal.5th at p. 253-254 [remanding for trial court's determination whether defendant driver was aware that passenger, after leaving car, had been detained.) "[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person. . . . [A] careful exploration of the outer surfaces of a person's clothing all over his or her body in an attempt to find weapons . . . performed in public by a policeman while the citizen stands helpless . . . is a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly." (*Terry v. Ohio* (1968) 392 U.S. 1, 16-17, fns. omitted.) Thus, Ferrante had " ' "restrained the liberty" ' " of the driver and one of the individuals on the sidewalk " ' "by means of physical force or show of authority," ' " effecting a " ' "seizure of th[ose] person[s]." ' " (*Tacardon*, *supra*, 14 Cal.5th at p. 241.)

By the time Ferrante asked T.F.-G. to "just come over here,"[10] T.F.-G. had observed the unmistakable and methodical treatment of the group of which he was an obvious member. Ferrante's systematic physical intrusion and show of authority as to Alex and E.L. would have objectively communicated to a reasonable person in T.F.-G.'s position that he was not free to go. (*Tacardon*, *supra*, 14 Cal.5th at pp. 253-254 ["show of authority towards others can communicate that the defendant is also not free to leave"]; *Brendlin*, *supra*, 551 U.S. at p. 257 ["a sensible person would not expect a police officer to allow people to come and go freely from the physical focal point of an investigation into faulty behavior or wrongdoing"].) This point was driven home when Ferrante insisted that T.F.-G. come over after T.F.-G. questioned why this was warranted.

T.F.-G.'s argument that the encounter reasonably appeared consensual finds superficial support in a litany of cases holding under the totality of the circumstances that a reasonable person would feel free to terminate an encounter with officers evincing interest in their immediate activities, background, and mere presence at a particular public location. (See, e.g., *People v. Lopez* (1989) 212 Cal.App.3d 289 [a man sitting on the hood of a parked car was free to leave officers on foot patrol who asked whether the car was his, what his reason was for sitting on a car that wasn't his, where his pool cue was if he was waiting for friends to play pool, and whether he had identification]; see *id.*

---

[10] Although T.F.-G. notes the officer's decision to frame the request as a question, he acknowledges that this framing is not independently dispositive. (Compare *J.G.*, *supra*, 228 Cal.App.4th at p., 412 ["the content or form of the question" may "impart[] . . . compulsion to comply"] and *Linn*, *supra*, 241 Cal.App.4th at p. 64, fn. 7 ["merely 'ask[ing]' [defendant] to put out her cigarette and put down her soda can . . . does not negate the coercive nature of the request"] with *People v. Cartwright* (1999) 72 Cal.App.4th 1362, 1370, fn. 10 (*Cartwright*) ["a mere request to exit a vehicle, as opposed to a command, is insufficient in and of itself to transform the contact into a detention"].) " 'It is not the nature of the question or request made by the authorities, but rather the manner or mode in which it is put to the citizen that guides us in deciding whether compliance was voluntary or not.' [Citation.]" (*People v. Garry* (2007) 156 Cal.App.4th 1100, 1112.)

at pp. 291, 294 (conc. opn. of Crosby, J.) ["In the real world . . . [y]ou are protected by the Fourth Amendment only to the extent you are willing to risk the physical violation of your person with armed officers."]; *Cartwright*, *supra*, 72 Cal.App.4th at pp. 1364-1365, 1369-1371 [holding that passenger in a routine traffic stop was not detained until she was told to sit on the curb, which occurred after law enforcement stopped the car, asked her the driver's name, asked her for identification, asked her if there was anything illegal in the car, and—having received her response that someone had left methamphetamine in her purse—asked for and received consent to search her purse]; *People v. Gonzales* (1985) 164 Cal.App.3d 1194, 1197 [uniformed officer requesting license and registration of parked car's occupants late at night was not a detention]; *People v. Franklin* (1987) 192 Cal.App.3d 935, 941 [asking that appellant remove his hands from his pockets did not convert the encounter into a detention].) We need not resolve the extent to which the hypothetical reasonable person's sense of freedom to rebuff an investigating officer has evolved in the intervening decades, because we find these authorities distinguishable from the totality of the circumstances here.

For example, in *United States v. Drayton* (2002) 536 U.S. 194 (*Drayton*), three plain-clothes officers boarded a bus—during a scheduled stop and with the driver's consent—to conduct routine drug and weapons interdiction not targeted at any particular passenger. (*Id.* at p. 197; see also *Tacardon*, *supra*, 14 Cal.5th at pp. 252-253 [discussing *Drayton*].) Although two officers positioned themselves at the front and rear of the bus, respectively, they did so without blocking the exit. (*Drayton*, *supra*, 536 U.S. at pp. 197-198.) The third officer spoke to the passengers in turn, starting from the rear of the bus and proceeding forward, about their travel plans and their luggage: the officer displayed his badge but positioned himself so he would not block the passenger's access to the aisle during questioning. (*Id.* at p. 198.) Addressing two people seated together, the officer informed them that the police were " 'attempting to deter drugs and illegal weapons being transported on the bus,' " and received permission to check a bag, in which he found no

contraband. (*Id.* at p. 199.) One of the two passengers then consented to a patdown, which resulted in the discovery of contraband and his arrest. (*Id.* at p. 199.) The other passenger then also consented to a patdown, which revealed objects similar to drug packaging and resulted in his arrest. (*Ibid.*) The United States Supreme Court held that there "were ample grounds for the District Court to conclude that 'everything that took place between Officer Lang and [the defendants] suggest[ed] that it was cooperative' and that there 'was nothing coercive [or] confrontational' about the encounter." (*Id.* at p. 204; see also *Bostick*, *supra*, 501 U.S. at p. 436 ["the mere fact that Bostick did not feel free to leave the bus did not mean that the police seized him" because as "a passenger on a bus that was scheduled to depart[] [h]e would not have felt free to leave the bus even if the police had not been present" and "whether or not the police conduct at issue was coercive"].) Here, in contrast, the officers interrupted their drive to engage with the group about illegal activity in its midst that, although minor, was sufficient to commence the successive detention and patsearch of the group's members in turn.

For the foregoing reasons, we find no fault with the juvenile court's determination that there was probable cause to arrest T.F.-G. for violation of section 148, subdivision (a), following his flight in response to a mandatory demand. (See *Muhammed C.*, *supra*, 95 Cal.App.4th at p. 1329.) Accordingly, we uphold the juvenile court's denial of T.F.-G.'s motion to suppress the evidence discovered through the search incident to that arrest and turn to the constitutional merits of the felony for which he was adjudicated a ward.

13

**B.** *Constitutionality of California's Firearm Licensing Regime[11]*

Section 25850, subdivision (a), provides: "A person is guilty of carrying a loaded firearm when the person carries a loaded firearm on the person or in a vehicle while in any public place or on any public street in an incorporated city or in any public place or on any public street in a prohibited area of unincorporated territory."

Although section 25850 in isolation appears broadly prohibitory, it exists within a framework of numerous express exemptions, including a discretionary licensing regime under section 26150 et seq. (See §§ 25900, 26000-26060, 26150, 26155, 26165, 26175, 26185; *D.L.*, *supra*, 93 Cal.App.5th at p. 154, fn. 4.) Specifically, a person licensed under section 26150 to carry a concealed handgun is exempt from section 25850's prohibition on carrying loaded firearms in public. (§ 26010.) Under section 26150, "the sheriff of a county may issue a [concealed-carry] license to [an eligible applicant] upon proof of all of the following: [¶] (1) The applicant is of good moral character. [¶] (2) Good cause exists for issuance of the license. [¶] (3) The applicant is a resident of the county or a city within the county, or the applicant's principal place of employment or business is in the county or a city within the county and the applicant spends a substantial period of time in that place of employment or business. [¶] (4) The applicant has completed a course of training [relating to firearms safety, handling, shooting, and permissible usage]." (§ 26150, subd. (a); see also § 26155, subd. (a) ["the chief or other head of a municipal police department of any city or city and county" may similarly issue licenses].) "An applicant for a license is fingerprinted and must pass a background

---

[11] In the juvenile court, T.F.-G. did not challenge the constitutionality of section 25850. We nonetheless reach his facial constitutional challenge because it presents a pure question of law subject to de novo review. (See *In re D.L.* (2023) 93 Cal.App.5th 144, 150 (*D.L.*); see also *People v. Mitchell* (2012) 209 Cal.App.4th 1364, 1370; *In re Sheena K.* (2007) 40 Cal.4th 875, 888-889; *Tos v. State* (2021) 72 Cal.App.5th 184, 195.)

14

check." (*D.L.*, *supra*, 93 Cal.App.5th at p. 155, fn. omitted, citing §§ 26185, subd. (a), 26195, subd. (a).)

Fundamentally, T.F.-G. argues that if any requirement for issuance of a license to carry a loaded firearm was unconstitutional, then the application of section 25850 to punish any unlicensed person must also be unconstitutional. T.F.-G.'s facial constitutional challenge requires a showing that the statute poses a " ' "total and fatal conflict with applicable constitutional prohibitions" ' " or at least "is invalid 'in the *generality* or *great majority* of cases.' " (Compare *Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084, 1102 (*Tobe*) [total and fatal conflict] with *People v. Buenrostro* (2018) 6 Cal.5th 367, 388 (*Buenrostro*) [explaining, in rejecting facial challenge, that the " 'minimum our cases have accepted is a showing that the statute is invalid 'in the *generality* or *great majority* of cases' "]; see also *T-Mobile West LLC v. City and County of San Francisco* (2019) 6 Cal.5th 1107, 1117, fn. 6 [noting divergent formulations of the standard]; *D.L.*, *supra*, 93 Cal.App.5th at p. 157 [applying " ' " 'total and fatal conflict' " ' " standard].) T.F.-G. has not made such a showing. Notwithstanding the conceded unconstitutionality of California's "good cause" requirement for issuance of a license as it was enforced pre-*Bruen*, California law continues to authorize the denial of license applications on statutory grounds not implicated by *Bruen*. Accordingly, T.F.-G. has not demonstrated that section 25850 is invalid in at least the generality or great majority of cases, much less that it is in total and fatal conflict with the Second and Fourteenth Amendments.

### 1.    *The Second Amendment*

The Second Amendment confers "an individual right to keep and bear arms." (*District of Columbia v. Heller* (2008) 554 U.S. 570, 595 (*Heller*); see also *McDonald v. City of Chicago* (2010) 561 U.S. 742, 791 (*McDonald*) [holding that the Fourteenth Amendment's Due Process Clause incorporates the Second Amendment right, making it

15

applicable to the states].)[12]  But "the right secured by the Second Amendment is not unlimited."  (*Heller*, *supra*, 554 U.S. at p. 626.)

In *Heller*, the Supreme Court held that a District of Columbia prohibition on the possession of usable handguns in the home violates the Second Amendment.  (*Heller*, *supra*, 554 U.S. at pp. 573, 635.)  The court explained that "the inherent right of self-defense has been central to the Second Amendment right" and the "handgun ban amount[ed] to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose."  (*Id*. at p. 628.)  The court cautioned, however, that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings," all of which the court described as examples of "presumptively" valid regulatory measures.  (*Id*. at pp. 626-627, fn. 26.)

In *Bruen*, the high court, in a six-to-three decision, extended *Heller* to recognize "an individual's right to carry a handgun for self-defense *outside* the home."  (*Bruen*, *supra*, 597 U.S. at. p. ___ [142 S.Ct. at p. 2122], italics added.)  Moreover, the court ruled that the licensing regime in New York, one of six states in which "the government . . . conditions issuance of a license to carry on a citizen's showing of some . . . special need," violates the Constitution by requiring an applicant to demonstrate "a special need for self-defense."  (*Ibid*.)

Even so, the *Bruen* court allowed that the Second Amendment right remains "subject to certain reasonable, well-defined restrictions."  (*Bruen*, *supra*, 597 U.S. at p. ___ [142 S.Ct. at p. 2156].)  The court provided a framework for evaluating whether a gun regulation violates the Constitution:  "When the Second Amendment's plain text

---

[12] The Second Amendment provides:  "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  (U.S. Const., 2d Amend.)

16

covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' " (*Id*. at p. ___ [142 S.Ct. at pp. 2129-2130].) Although the court stopped short of providing "an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," it did point to "two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." (*Id*. at p. ___ [142 S.Ct. at pp. 2132-2133].)

In a concurrence, Justice Kavanaugh, joined by Chief Justice Roberts, wrote "to underscore . . . the limits of the Court's decision."[13] (*Bruen*, *supra*, 597 U.S. at p. ___ [142 S.Ct. at p. 2161] (conc. opn. of Kavanaugh, J.).) *Bruen* "does not prohibit States from imposing licensing requirements for carrying a handgun for self-defense. In particular, the Court's decision does not affect the existing licensing regimes—known as 'shall-issue' regimes—that are employed in 43 States." (*Ibid.*)[14] "New York's outlier may-issue regime is constitutionally problematic because it grants open-ended discretion to licensing officials and authorizes licenses only for those applicants who can show some special need apart from self-defense. Those features of New York's regime . . . deny the right to carry handguns for self-defense to many 'ordinary, law-abiding citizens.' " (*Ibid.*)

---

[13] Chief Justice Roberts and Justice Kavanaugh were two of the six members of the majority. The three dissenting justices would not have struck down the licensing regime "without considering the State's compelling interest in preventing gun violence." (*Bruen*, *supra*, 597 U.S. at p. ___ [142 S.Ct. at p. 2165] (dis. opn. of Breyer, J.).)

[14] " '[S]hall issue' jurisdictions" require "authorities [to] issue concealed-carry licenses whenever applicants satisfy certain threshold requirements, without granting licensing officials discretion to deny licenses based on a perceived lack of need or suitability." (*Bruen*, *supra*, 597 U.S. at p. ___ [142 S.Ct. at p. 2123], fn. omitted.)

17

## 2. *Facial and As-Applied Challenges*

"A facial challenge to the constitutional validity of a statute or ordinance considers only the text of the measure itself, not its application to the particular circumstances of an individual. [Citation.] ' "To support a determination of facial unconstitutionality, voiding the statute as a whole, petitioners cannot prevail by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular *application* of the statute . . . . Rather, petitioners must demonstrate that the act's provisions inevitably pose a present total and fatal conflict with applicable constitutional prohibitions." ' " (*Tobe*, *supra*, 9 Cal.4th at p. 1084; see also *Regina v. State* (2023) 89 Cal.App.5th 386, 401; *D.L.*, *supra*, 93 Cal.App.5th at p. 157.) Put differently, "[a] facial challenge seeks to void the statute as a whole by showing that ' "no set of circumstances exists under which the Act would be valid," *i.e.*, that the law is unconstitutional in all of its applications.' " (*D.L.*, *supra*, 93 Cal.App.5th at p. 157, quoting *Washington State Grange v. Washington State Republican Party* (2008) 552 U.S. 442, 449.) "[T]he 'minimum' our cases have accepted is a showing that the statute is invalid 'in the *generality* or *great majority* of cases.' " (*Buenrostro*, *supra*, 6 Cal.5th at p. 388.)

In contrast, "[a]n as applied challenge may seek . . . relief from a specific application of a facially valid statute or ordinance to an individual or class of individuals who are under allegedly impermissible present restraint or disability as a result of the manner or circumstances in which the statute or ordinance has been applied." (*Tobe*, *supra*, 9 Cal.4th at p. 1084.) Such a challenge "contemplates analysis of the facts of a particular case or cases to determine the circumstances in which the statute or ordinance has been applied and to consider whether in those particular circumstances the application deprived the individual to whom it was applied of a protected right. [Citations.] When a criminal defendant claims that a facially valid statute or ordinance has been applied in a constitutionally impermissible manner to the defendant, the court

18

evaluates the propriety of the application on a case-by-case basis to determine whether to relieve the defendant of the sanction." (*Ibid.*)

### 3. *Analysis*

T.F.-G., in his words, "makes a facial challenge to the law he was found to have violated." Because T.F.-G. challenges the constitutionality of section 25850 on its face and not as applied to him, his challenge does not turn on his personal characteristics—his youth, his reasons for carrying the loaded firearm, or his reasons for fleeing the police. He need not demonstrate that the hypothetical denial of a license—had he applied for one—would have offended the Second Amendment. (*D.L.*, *supra*, 93 Cal.App.5th at p. 157, fn. omitted [facial challenge to section 25850 "does not raise any question about whether [a juvenile] was or would have been denied a license and, if so, why"].) Instead, seeking to neuter California's licensing regime in toto, he must show that enforcement of the licensing regime infringes Second Amendment rights in at least the generality or great majority of cases.

T.F.-G. contends that section 25850 is unconstitutional if any part of California's licensing scheme is unconstitutional, and the Attorney General concedes that section 26150 is unconstitutional under *Bruen* insofar as it restricts access to licenses by imposing a good cause requirement.[15] Thus, T.F.-G. contends that section 25850 must also be unconstitutional. As we explain, T.F.-G.'s facial challenge falls short because the constitutional defect in California's licensing scheme reaches only a narrower subset of the cases to which section 25850 applies.

---

[15] T.F.-G. also argues that a separate provision, section 29610, that makes it generally unlawful for minors to possess guns is unconstitutional under *Bruen* because there is no historical tradition of barring all minors from possessing guns. But, as T.F.-G. recognizes, although he was charged with a violation of section 29610 that charge was dismissed. Due to this dismissal, T.F.-G. lacks a beneficial interest in adjudicating a facial challenge to the constitutionality of section 29610. (See *Teal v. Superior Court* (2014) 60 Cal.4th 595, 599 (*Teal*).)

19

As a threshold matter, we reject the Attorney General's contention that T.F.-G. lacks standing to challenge the constitutionality of section 25850 unless he can demonstrate that the "public-carry licensing scheme is unconstitutional as applied to him"— meaning that T.F.-G. would have been able to obtain a license but for the unconstitutional provision.[16]  Citing *Ellison v. Connor* (5th Cir. 1998) 153 F.3d 247, 254-255, the Attorney General argues that T.F.-G. lacks standing because he did not " 'submit to the challenged policy.' "  But T.F.-G. is not a member of the general public attempting to challenge a regulatory regime that has done him no harm, he is challenging his wardship adjudication under a penal statute—an enforcement mechanism of the regulatory regime that he contends is unconstitutional.  (See *D.L.*, *supra*, 93 Cal.App.5th at p. 161.)  Moreover, he is subject to ongoing consequences of section 25850's application—leaving aside his juvenile probation status, the fact of the adjudication bars him from possessing, owning, or controlling any and all firearms until his 30th birthday.  (See *Teal*, *supra*, 60 Cal.4th at p. 599 [standing requires concrete and actual beneficial interest in a justiciable controversy].)

Notwithstanding T.F.-G.'s standing to raise his claims, on the merits of his facial challenge to section 25850, he is unable to meet the heavy burden of establishing that in at least the generality or great majority of cases, it will be unconstitutional to criminalize carrying a loaded firearm in public without satisfying one of the statutory exemptions, such as complying with California's licensing regime.  (See *Buenrostro*, *supra*, 6 Cal.5th at p. 388; see also *Tobe*, *supra*, 9 Cal.4th at p. 1084; *D.L.*, *supra*, 93 Cal.App.5th at pp. 156-158.)

---

[16] In reply to this argument, T.F.-G. contended that he was prevented from obtaining a license by the unconstitutional good cause requirement of section 26150. Nevertheless, T.F.-G. reaffirmed in a supplemental letter brief that, as articulated in his opening brief, his appeal raises only a facial challenge.

We begin with the conceded constitutional infirmity in California's licensing regime as it existed at the time of T.F.-G.'s offense.  Under *Bruen*, New York's "proper cause" license requirement was unconstitutional because it prevented "law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms."  (*Bruen*, *supra*, 597 U.S. at p. ___ [142 S.Ct. at p. 2156].)  The petitioners included Koch and Nash, "law-abiding, adult citizens" whom at the first step of its analysis the *Bruen* Court deemed to have a presumptively protected right to bear arms.  (*Id*. at p. ___ [142 S.Ct. at pp. 2124-2125, 2134-2135].)  Thus, the fundamental precept of *Bruen* is that the "proper cause" requirement unconstitutionally operated "to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose."  (*Id*. at. p. ___ [142 S.Ct. at p. 2150].)  California's good cause requirement, as it existed, is undisputedly susceptible to the same challenge.

*Bruen*, *McDonald*, and *Heller* did not involve facial constitutional challenges to provisions criminalizing carrying firearms without a license, but only challenges to particular restrictions on either the availability or utility of licenses.  In *Bruen*, Brandon Koch and Robert Nash successfully challenged the proper-cause requirement in New York's licensing scheme—under which they were denied for failure to demonstrate a unique need for self-defense—because New York could not condition the issuance of a license on such a showing.  (*Bruen*, *supra*, 597 U.S. at. p. ___ [142 S.Ct.142 S.Ct. at pp. 2124-2125, 2138.)  In *Heller*, Dick Heller applied for a registration certificate for a handgun he wished to keep at home and, following denial, mounted a successful challenge to bans on handgun possession in the home and rendering lawful firearms in the home operable for the purpose of immediate self-defense.  (*Heller*, *supra*, 554 U.S. at pp. 575-576, 635.)  Similarly, in *McDonald*, Otis McDonald, Adam Orlov, Colleen Lawson, and David Lawson challenged city-level bans on the registration of most handguns, which precluded them from keeping handguns in their homes.  (*McDonald*, *supra*, 561 U.S. at p. 750.)

21

T.F.-G.'s facial challenge is fundamentally different. He challenges neither the application of a licensing requirement to unconstitutionally infringe his right to bear arms nor the imposition of criminal penalties against him as a consequence of such requirement, but instead the state's authority to impose criminal penalties on *any* individual who carries a loaded handgun in public in violation of the state's license regime, regardless of whether the noncompliance stemmed from a constitutionally sound requirement.

In *Bruen*, the state's power to do so was not called into question. There, the Supreme Court confirmed that states may impose "reasonable, well-defined" restrictions on the constitutionally protected "right to bear commonly used arms in public" and set forth the means by which courts may evaluate whether licensing requirements withstand constitutional scrutiny. (*Bruen*, *supra*, 597 U.S. at p. ___ [142 S.Ct. at pp. 2129-2130, 2134-2135, 2156]; see also *Heller*, *supra*, 554 U.S. at pp. 626-627.) Indeed, the *Bruen* Court was "clear" that "nothing in [its] analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes, under which a 'general desire for self-defense is sufficient to obtain a [permit].' [Citation.] Because these licensing regimes do not require applicants to show an atypical need for armed self-defense, they do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry. [Citation.] Rather, it appears that these shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.' [Citation.] And they likewise appear to contain only 'narrow, objective, and definite standards' guiding licensing officials, [citation], rather than requiring the 'appraisal of facts, the exercise of judgment, and the formation of an opinion,' [citation]—features that typify proper-cause standards like New York's." (*Bruen*, *supra*, 597 U.S. at p. ___ [142 S.Ct. at p. 2138], fn. 9; see also *id.* at p. ___ [142 S. Ct. at p. 2162] (conc. opn. of Kavanaugh, J.).)

22

If a state may enforce a licensing regime, then a state may impose penalties for noncompliance, as may be illustrated by examples drawn from several of the 43 "shall issue" jurisdictions the *Bruen* majority expressly refrained from criticizing. (See, e.g., 430 Ill. Comp. Stat. 65/14(c) (2022) [Illinois statute imposing criminal penalties as part of licensing regime]; La. Stat. Ann. 14:95 (June 23, 2022) [Louisiana statute imposing criminal penalties as part of licensing regime]; Neb. Rev. Stat. § 28-1202 (2022) [Nebraska statute imposing criminal penalties as part of licensing regime]; N.C. Gen. Stat. § 14-415.21 (2022) [North Carolina statute imposing criminal penalties as part of licensing regime]; *Bruen*, *supra*, 597 U.S. at p. ___ [142 S.Ct. at pp. 2124, 2138, fn. 9] [identifying only New York, California, the District of Columbia, Hawaii, Maryland, Massachusetts, and New Jersey as jurisdictions whose licensing regimes posed the constitutional infirmities the court identified].) To the extent that, under *Bruen*, a state may impose a licensing regime because the Second Amendment right to bear arms may be denied to some citizens—provided the reasons therefore are "reasonable" and "well[]defined" (see *Bruen*, *supra*, 597 U.S. at p. ___ [142 S.Ct. at p. 2156])—it follows that there are citizens who may constitutionally be subject to sanctions for the unlicensed carrying of a firearm.

We do not accept T.F.-G.'s premise that section 25850 is facially unconstitutional if any licensing regulation in California may be invoked to unconstitutionally deny a license. Although framed as a default prohibition, section 25850 is in effect the enforcement mechanism of a regulatory regime that grants licenses to those who may lawfully carry firearms and withholds licenses from those who may not. As such, the scope of section 25850 is inherently broader than the scope of a given licensing regulation, including the unconstitutional good cause requirement. Although section 25850 may have unconstitutional application where denial of licensing turned on the good cause requirement, T.F.-G. does not claim that it may not constitutionally apply where the denial of a license turned on the applicant's violent criminal history or failure

23

to undergo firearms safety training. (Cf. *Bruen*, *supra*, 597 U.S. at p. ___ [142 S.Ct. at pp. 2134-2135] [discussing the rights of "ordinary, law-abiding, adult citizens" to " 'bear' arms in public for self-defense"].) To prevail on a facial constitutional challenge to section 25850, it is not enough to show that a statute may have an unconstitutional application to a hypothetical person lawfully carrying a firearm in public for self-defense after failing to secure a license due to a "good cause" requirement.[17] Instead, a facial challenge succeeds only where a statute is unconstitutional in all or at least the generality or great majority of cases. (See *Tobe*, *supra*, 9 Cal.4th at p. 1084; *Buenrostro*, *supra*, 6 Cal.5th at p. 388.)[18]

To hold that section 25850, the enforcement mechanism of the licensing regime, is facially unconstitutional, we would need to find that section 25850 has no significant application in constitutionally valid circumstances—i.e., that it is unconstitutional in at least the generality or great majority of cases. (See generally *D.L.*, *supra*, 93 Cal.App.5th at pp. 165-166.) Although we can identify two theoretical pathways to such a conclusion, neither is available here, because the constitutional defect is severable from the broader licensing regime, and the state retains authority to regulate firearm possession via licensure.

First, if a particular licensing condition renders the entire licensing regime unconstitutional, then it may become unconstitutional to impose penalties for failure to obtain a license. But we follow the *D.L.* court's persuasive determination that the "good cause" licensing requirement is severable from the balance of California's licensing

---

[17] These are not, however, the facts before us. The likelihood that an affected individual may be able to mount a successful as-applied challenge to an apparently overbroad statute is distinct from facial unconstitutionality. (See *Tobe*, *supra*, 9 Cal.4th at p. 1084; *Buenrostro*, *supra*, 6 Cal.5th at p. 388.)

[18] Like the minor in *D.L.*, T.F.-G. has not made an argument based on overbreadth. (*D.L.*, *supra*, 93 Cal.App.5th at p. 154, fn. 4.)

requirements, such that a functioning licensing regime remains in place if the good cause requirement were removed.  (*D.L.*, *supra*, 93 Cal.App.5th at pp. 163-165.)[19]  Assuming that the good cause requirement is susceptible to a facial constitutional challenge under *Bruen* because it can never constitutionally be applied to deny a license, there are independent licensing restrictions in California.  Section 25850 imposes penalties not only on individuals who are wrongfully denied licenses based on the unconstitutional good cause requirement, but on individuals who cannot or do not obtain licenses due to constitutionally valid restrictions and engage in prohibited conduct—i.e., carry a loaded firearm in public where no exception makes it permissible to do so.

Second, to the extent the unconstitutional condition is severable, T.F.-G.'s facial challenge to the enforcement provision requires either an interpretation of the Second Amendment that would bar California from requiring licenses at all or else a showing that the remaining licensing conditions render section 25850 unconstitutional at least "in the generality or great majority of cases."  *Bruen* does not support a categorical ban on a state's authority to require licenses.  Indeed, T.F.-G. recognizes this, in framing the inquiry as whether, post-*Bruen*, "there are any . . . provisions of California's gun laws that render . . . section 25850 constitutional."[20]  And among California's licensing

---

[19] Like in *D.L.*, the Attorney General asserts that, the day after the Supreme Court's decision in *Bruen* was announced, the Attorney General issued an alert recognizing that the good cause requirement was no longer constitutional, instructing local officials not to enforce the good cause requirement, but advising local officials to continue to apply and enforce all other statutory prerequisites to obtaining a public-carry license.  (See *D.L.*, *supra*, 93 Cal.App.5th at pp. 147, 152.) T.F.-G. neither disputes this factual proposition nor the legal proposition that the good cause requirement is severable.

[20] In his initial framing of what he described as a facial challenge, T.F.-G. appeared to invite us to narrow our focus to section 25850's application to him, rather than all applications of section 25850.  T.F.-G. has subsequently agreed that the resolution of the issues before us "requires no examination of the particular facts of" his case.

25

conditions, T.F.-G. stops short of challenging them all.[21] (See *D.L.*, *supra*, 93 Cal.App.5th at pp. 154-155.) Post-*Bruen*, courts have continued to hold that at least some categories of convicted felons may be denied the right to bear arms, as is the case in California. (See *id*. at pp. 158, fn. 8, 165-166; *People v. Alexander* (2023) 91 Cal.App.5th 469, 480; *People v. Odell* (2023) 92 Cal.App.5th 307, 447; see also *United States v. Jackson* (8th Cir. 2023) 69 F.4th 495, 501-506; *United States v. Cunningham* (8th Cir. 2023) 70 F.4th 502, 506; *United States v. Davis* (E.D. Cal. Mar. 14, 2023) 2023 WL 2505039, at p. *4; *United States v. Jackson* (D. Md. Mar. 13, 2023) ___ F.Supp.3d ___, 2023 WL 2499856, at p. *18 [federal restriction on receiving or transporting firearms while under a felony indictment is consistent with historical tradition on regulating firearms].) We acknowledge that certain as-applied challenges have been upheld by federal circuit courts. (See, e.g., *Range v. United States* (3d Cir. 2023) 69 F.4th 96, 106 (*Range*) [after rehearing en banc, holding "narrow[ly]" that individual convicted of a felony for making false statements remained one of " 'the people' " protected by the Second Amendment and that a federal statute preventing him from receiving a firearm shipped in interstate commerce was unconstitutional under *Bruen*]; *Atkinson v. Garland* (7th Cir. 2023) 70 F.4th 1018, 1023-1024 (*Atkinson*) [remanding for

---

[21] The historical test set forth in *Bruen* is intended to test the constitutionality of a firearm regulation. (*Bruen*, *supra*, 597 U.S. at p. ___ [142 S.Ct. at pp. 2129-2130].) T.F.-G. has not challenged the state's authority to require licenses nor each firearm regulation that could prevent an individual from obtaining a license under California's regulatory scheme. Moreover, the two-step *Bruen* framework has limited utility in the context of T.F.-G.'s facial challenge, because the first step of that framework presupposes that the existence of a presumptive right to bear arms is situational—potentially depending at least on the purposes for which arms are borne and the past conduct of the person bearing arms. (See *Id.* at p. ___ [142 S.Ct. at pp. 2134-2156].) T.F.-G.'s facial challenge to the enforcement mechanism, as opposed to a particular licensing restriction, would render the first step of the *Bruen* framework a nullity. Given the focus of T.F.-G.'s facial challenge, we do not hold the state to the burden of demonstrating the constitutional validity of its unchallenged regulations.

historical analysis regarding federal statute prohibiting individuals convicted of a crime punishable by imprisonment for a term exceeding one year from shipping or transporting any firearm or ammunition in interstate commerce or receiving any firearm or ammunition shipped in interstate commerce]; *United States v. Rahimi* (5th Cir. 2023) 61 F.4th 443, 448 (*Rahimi*) [federal prohibition on possession of firearms by someone subject to a domestic violence restraining order is unconstitutional].)[22]  Because these were as-applied challenges, they do not assist T.F.-G. in his facial challenge to section 25850.  Whatever fate may be in store for the long-standing prohibition on the possession (public or private) of firearms (loaded or unloaded) by those with criminal histories deemed disqualifying (see, e.g., §§ 29800, 29900 & 30305; see also 18 U.S.C. § 922(g)), T.F.-G. makes no attempt to argue that California's requirement for fingerprint identification or a criminal background check operates unconstitutionally in the generality or great majority of unlicensed cases, and we have no basis to conclude that it does.  (See *D.L.*, *supra*, 93 Cal.App.5th at p. 155 [background check required as a condition of licensure "is intended to confirm the applicant is not disqualified from possessing or owning a firearm"].)

For the foregoing reasons, we reject T.F.-G.'s facial challenge to section 25850.

_____

[22] In a supplemental brief, the Attorney General argues that minors such as T.F.-G. are not presumptively protected by the Second and Fourteenth Amendment right to bear arms.  We need not render an opinion on this unsettled issue to resolve T.F.-G.'s facial challenge.  (See *D.L.*, *supra*, 93 Cal.App.5th at p. 157, fn. 8 [observing that as a minor D.L. could not have obtained a concealed carry license while rejecting D.L.'s facial challenge without addressing whether minors are presumptively protected].)  Further, to the extent that *Range*, *Atkinson*, and *Rahimi* suggest that care must be taken to assess whether a particular person has lost the protection of the Second Amendment as a result of a felony conviction, that underscores the fundamental point here.  We have not been asked to assess whether California's decision to criminalize carrying a firearm without a license is unconstitutional as applied to T.F.-G., but whether California's decision to criminalize carrying a firearm without a license is facially unconstitutional because some individuals may have been denied a license for unconstitutional reasons even if other individuals could constitutionally be denied a license.

### III.   DISPOSITION

The judgment is affirmed.

_____
LIE, J.


I CONCUR:


_____
GROVER, ACTING P.J.


*People v. T.F.-G.*
H050112

Bromberg, J., concurring

I respectfully concur in the judgment. I agree with the majority's analysis of the motion to suppress and join in its conclusion that the police had probable cause to arrest T.F.-G. for resisting a peace officer under Penal Code section 148. However, I would decline to reach T.F.-G.'s Second Amendment challenge to the state's firearms licensing requirements.

As the majority points out, although T.F.-G. failed to raise a Second Amendment challenge in the trial court, we have discretion to consider this challenge on appeal because it raises a pure question of law. (See, e.g., *Ward v. Taggart* (1959) 51 Cal.2d 736, 742.) T.F.-G, however, has raised an unusual question of law. Under the Supreme Court's developing Second Amendment jurisprudence, to establish the validity of a restriction on carrying firearms the government must show the restriction is "consistent with the Nation's historical tradition of firearm regulation." (*New York Rifle & Pistol Association, Inc. v. Bruen* (2022) 597 U.S. ___, ___ [142 S.Ct. 2111, 2129-2130, 2138] (*Bruen*); *District of Columbia v. Heller* (2008) 554 U.S. 570, 592-595.) And in assessing that tradition, the Supreme Court has analyzed difficult-to-obtain historical materials such as state statutes and judicial opinion from the colonial, early republic, and antebellum eras. (*Bruen*, *supra*, 597 U.S. at p.___ [142 S.Ct. at pp. 2138-2150].) Until case law defines the nation's historical tradition of firearm regulation, I do not believe that we should apply the Second Amendment without the benefit of such historical materials.

T.F.-G. has not offered any historical materials or analysis in support of his Second Amendment challenge. In addition to placing the government at an unfair disadvantage on appeal, and depriving this court of the trial court's views, the failure to supply historical materials or analysis makes it difficult for this court to engage in the historical determination that the Supreme Court now appears to require. Consequently, I do not believe that we are in a position to properly evaluate T.F.-G.'s Second Amendment challenge and therefore should not entertain it.

Accordingly, I concur in the majority's decision to affirm the judgment.

_____
Bromberg, J

People v. T.F.-G.
H050112

Trial Court:                                      Santa Clara County
                                                  Superior Court No.:  21JV45239A


Trial Judge:                                      The Honorable Franklin E. Bondonno
                                                  The Honorable L. Michael Clark



Attorneys for Defendant and Appellant            Lori A. Quick
T.F.-G.:                                          under appointment by the Court
                                                  of Appeal for Appellant

                                                  Jeffrey Manning-Cartwright
                                                  under appointment by the Court
                                                  of Appeal for Appellant


Attorneys for Plaintiff and Respondent           Rob Bonta
The People:                                       Attorney General

                                                  Lance E. Winters,
                                                  Chief Assistant Attorney General

                                                  Jeffrey M. Laurence,
                                                  Senior Assistant Attorney General

                                                  Eric D. Share,
                                                  Supervising Deputy Attorney General

                                                  Brady Baldwin,
                                                  Deputy Attorney General

*People v. T.F.-G.*
H050112